PARIENTE, J.'
The issue before this Court is whether Florida’s absolute privilege, which shields judges, counsel, parties, and witnesses from liability for alleged defamatory statements made in the course of a judicial proceeding, extends to statements made by an attorney during ex-parte, out-of-court questioning of a potential, nonparty witness while investigating matters connected to a pending lawsuit. In DelMonico v. Traynor, 50 So.3d 4 (Fla. 4th DCA 2010), the Fourth District Court of Appeal relied on this Court’s decision in Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Insurance Co., 639 So.2d 606 (Fla.1994), to hold that regardless of the circumstances under which an attorney interviews a potential witness in preparation for pending litiga^ tion, statements made during that interview are absolutely privileged if the statements bear some relation to or connection with the pending matter. We have jurisdiction because the Fourth District misapplied this Court’s long established precedent, of which Levin is a part, regarding the proper scope of Florida’s absolute privilege. See art. V, § 3(b)(3), Fla. Const.; see also Wallace v. Dean, 3 So.3d 1035, 1040 (Fla.2009) (recognizing misapplication of decisions as a basis for express and direct conflict under article V, section 3(b)(3), of the Florida Constitution).
We hold that Florida’s absolute privilege, as this Court has developed the common law doctrine, was never intended to sweep so broadly as to provide absolute immunity from liability to an attorney for alleged defamatory statements the attorney makes during ex-parte, out-of-court questioning of a potential, nonparty witness in the course of investigating a pending lawsuit. In this narrow scenario, we conclude that a qualified privilege instead should apply to ex-parte, out-of-court statements, so long as the alleged defamatory statements bear some relation to or connection with the subject of inquiry in the underlying lawsuit. A qualified privilege requires the plaintiff to establish express malice. However, where the statements do not bear some relation to or connection with the subject of inquiry in the underlying lawsuit, the defendant is not entitled to the benefit of any privilege — either absolute or qualified.
Providing a qualified privilege under the circumstances of this case, which involves an attorney’s ex-parte, out-of-court questioning of several nonparty witnesses, is sufficiently protective of the competing policies underpinning the privilege: “[T]he right of an individual to enjoy a reputation unimpaired by defamatory attacks versus the right of the public interest to a free and full disclosure of facts in the conduct of judicial proceedings.” Levin, 639 So.2d at 608. We adopt the reasoning of Judge Warner’s scholarly dissent in the decision *1209 below that the purpose of absolute immunity is not “advanced by protecting a lawyer who is defaming a party to a witness outside of a proceeding at a time when both parties are not present and do not have an opportunity to be heard.” DelMonico, 50 So.3d at 12 (Warner, J., dissenting). We therefore quash the Fourth District’s decision in DelMonico.
FACTS AND PROCEDURAL HISTORY
The present case arises out of actions that an attorney, Arthur Rodgers Traynor, Jr., allegedly took in the course of investigating an underlying defamation action he was hired to defend. The legal issue is whether absolute immunity applies to Traynor’s alleged defamatory statements allegedly made in the course of his investigation.
Specifically, in the underlying defamation action (the Crespo defamation action), Daniel DelMonico, the president of MYD Marine Distributor, Inc. (MYD), sued business competitors Donovan Marine, Inc. (Donovan) and Tony Crespo, the latter of whom was a sales representative at Donovan. In that action, DelMonico asserted that Crespo had defamed DelMonico by telling a number of DelMonico’s clients that DelMonico, in a successful attempt to lure customers away from Donovan, had supplied prostitutes to the owner of a company doing business with Donovan.
To defend against DelMonico’s Crespo defamation action, Donovan and Crespo together retained the services of attorney Arthur Rodgers Traynor, Jr., and Tray-nor’s law firm. While the underlying Crespo defamation action was pending, DelMonico and MYD (collectively Plaintiffs), filed a separate action against Tray-nor and his law firm (collectively Defendants), asserting claims of defamation and tortious interference with a business relationship. ■ In this separate action, the Plaintiffs alleged that Traynor had made numerous false statements about DelMoni-co to various individuals Traynor had contacted as potential witnesses in the Crespo defamation action. The complaint against Traynor set forth the following allegations:
Traynor contacted one of DelMonico’s ex-wives and told her that DelMonico had wrongfully taken a customer from Traynor’s client by enticing the customer’s purchasing agent with prostitutes; Traynor contacted a former employee of MYD and told him that DelMonico’s method of taking a client away from Donovan was to supply a prostitute to the owner of the business. Traynor then stated that, with the employee’s former proximity to DelMonico, he would surely be able to give additional examples of DelMonico’s unethical business practices;
Traynor contacted Jack Nome, who is the past owner of a company called New Nautical Coatings, Inc. (New Nautical), and the father of the current owner of New Nautical. New Nautical manufactures Sea Hawk brand marine paint, and MYD was the exclusive worldwide distributor of Sea Hawk products under contract with New Nautical. Traynor told Norrie that DelMonico was being “prosecuted for prostitution”;
Traynor contacted another of DelMoni-co’s ex-wives and told her that DelMoni-co was “being prosecuted for using prostitution to get some business”;
Traynor contacted an employee of Bradford Marine, Inc. (Bradford), a company that was a substantial consumer of Sea Hawk brand marine paint through MYD, and advised him that DelMonico was being prosecuted for prostitution. Bradford’s purchasing agent, Enrique Pietri, subsequently contacted New Nautical and advised that he had been *1210 instructed by his superiors to locate a supplier other than MYD for Sea Hawk brand products, and if Bradford was forced to purchase Sea Hawk products exclusively from MYD, then Bradford would no longer buy Sea Hawk products at all;
New Nautical was contacted by other companies that were consumers of Sea Hawk brand products through MYD. Representatives from these companies stated that rather than purchasing the products through MYD, they wished to buy the products directly from New Nautical or another distributor because they were told that MYD’s principal, DelMonico, was being prosecuted for prostitution or procuring prostitutes for purchasing agents.
The Plaintiffs’ complaint alleged that as a result of Traynor’s actions in making false and malicious statements, MYD lost its exclusive distributorship of Sea Hawk brand products, which led to the loss of income, profits, business, and investment opportunities. The Plaintiffs also filed affidavits in support of their allegations and estimated that the loss of their exclusive distributorship of Sea Hawk paint alone cost MYD between seven and nine million dollars.[1]
Pietri, Bradford’s purchasing agent, signed an affidavit stating that Traynor told Pietri that Traynor was “involved in the prosecution of Dan DelMonico for prostitution.” DelMonico’s ex-wife signed an affidavit in which she swore, “Mr. Tray-nor stated that Mr. DelMonico was being prosecuted for prostitution, and that he was part of the team of people going after him really hard because Mr. DelMonico had done some embarrassing and illegal things.” According to the affidavit, “Tray-nor stated that if they found evidence that showed [the ex-wife] knew about Mr. Del-Monico’s criminal activities and did not tell them ... [she] could have a legal problem.” Traynor later acknowledged during a deposition and in an affidavit to having interviewed prospective witnesses in connection with the Crespo defamation action, but he denied stating to anyone that Del-Monico was being prosecuted for prostitution.
The Defendants moved for summary final judgment, asserting in pertinent part that the Plaintiffs’ claims were barred because Traynor’s alleged statements were absolutely privileged under Florida law. Relying on precedent from this Court, the Defendants asserted that even if the allegations were true, no such action could be brought because the alleged defamatory statements occurred during witness interviews conducted for the purpose of defending their clients, Donovan and Crespo, in pending litigation and were clearly made in the course of a judicial proceeding. According to the Defendants, these facts supported application of an absolute privilege to shield them from suit.
At a hearing on the summary judgment motion, the trial court expressed concern as to the competing policies implicated by the absolute privilege. The trial court questioned “whether or not developing a witness for litigation [was] in the course of a judicial proceeding ... contemplated by Levin” and opined that “a strong argument for a qualified privilege” existed. The trial court nevertheless entered a summary final judgment in favor of the Defendants because it felt bound by this Court’s decision in Levin, which held that statements made during the course of a *1211 judicial proceeding are entitled to an absolute privilege.
Over a dissent, a panel of the Fourth District affirmed and categorically held that statements made while “[ijnterviewing a witness in preparation for and connected to pending litigation [are] absolutely privileged.” DelMonico, 50 So.3d at 7. The Fourth District reasoned that an attorney “should receive the same absolute immunity in questioning potential witnesses before their appearance at deposition or in the courtroom, as if the questioning were during a formalized judicial proceeding.” Id. Applying those principles to the facts of this case, and relying on this Court’s decision in Levin, the Fourth District concluded that “[b]ecause the statements complained of were made by [Traynor] while he was acting as defense counsel in the underlying litigation, and the statements bore ‘some relation’ to the proceeding, they were absolutely privileged as a matter of law.” Id. (quoting Levin, 639 So.2d at 608).
In a dissenting opinion, Judge Warner wrote that an attorney’s ex-parte defamatory statements to others in the context of defending a lawsuit should not fall within the absolute privilege articulated in Levin. See id. at 8, 10 (Warner, J., dissenting). Instead, Judge Warner believed that allegedly defamatory statements should be subject only to a qualified privilege when made during the course of legal representation but outside of a legal proceeding, where both parties are not present and there is no opportunity to be heard. See id. at 12. Recognition of a qualified privilege, Judge Warner reasoned, would “deter frivolous lawsuits” because the plaintiff would still be required “to prove both that the statements were false and that they were made with express malice” while concomitantly discouraging “participants in the investigatory process outside judicial proceedings from intentionally harming their adversary with impunity.” Id.
ANALYSIS
The issue before this Court is whether Florida’s absolute privilege extends to alleged defamatory ex-parte, out-of-court statements made by an attorney to potential, nonparty witnesses in the course of that attorney’s investigation of a pending lawsuit. This is a pure question of law, subject to de novo review. See Bosem v. Musa Holdings, Inc., 46 So.3d 42, 44 (Fla.2010).
I. Historical Development of Florida’s Absolute Privilege
To resolve this issue first requires examining the history of the absolute privilege and its application to statements made during judicial proceedings as has been developed in Florida. The law has long recognized that judges, counsel, parties, and witnesses should be absolutely exempted from liability to an action for defamatory words published in the course of judicial proceedings, regardless of how false or malicious the statements may be, as long as the statements bear some relation to or connection with the subject of inquiry. The origin of this absolute privilege, sometimes referred to as a judicial or litigation privilege, traces back to the English common law:
This privilege is a common law creation with a 400-year history. In 1591, in one of the earliest English cases to apply the privilege, a plaintiff brought a defamation action after the defendant accused the plaintiff in a document filed with a court of being “a maintainer of pirates and murderers.” Buckley v. Wood, (1591) 76 Eng. Rep. 888 (K.B.). The English court found for the defendant, holding that “for any matter contained in the bill that was examinable in the *1212 said Court, no action lies, although the matter is merely false, because it [the defamatory publication] was in [the] course of justice.” Id. at 889....
Following centuries of English application, the litigation privilege gained widespread acceptance in U.S. courts....
Simpson Strong-Tie Co. v. Stewart, Estes, & Donnell, 282 S.W.3d 18, 22 (Tenn.2007) (alterations in original).
As cogently explained by one court, the public policy of preserving the integrity of the judicial process underpins this common law privilege:
A judge must be free to administer the law without fear of consequences. This independence would be impaired were he to be in daily apprehension of defamation suits. The privilege is also extended to parties to afford freedom of access to the courts, to witnesses to encourage their complete and unintimi-dated testimony in court, and to counsel to enable him to best represent his client’s interests.
Panitz v. Behrend, 429 Pa.Super. 273, 632 A.2d 562, 564 (1993) (quoting Binder v. Triangle Publ’ns, Inc., 442 Pa. 319, 275 A.2d 53, 56 (1971)).
More than one hundred years ago, this Court aligned itself with the common law and the “overwhelming” trend in other jurisdictions by recognizing Florida’s absolute privilege in the bellwether case of Myers v. Hodges, 53 Fla. 197, 44 So. 357, 361 (1907). In the underlying civil action in Myers, Hodges filed suit in a court of equity against a corporation of which Myers was president. Id. at 358, 363. The complaint stated that Myers “was and is held as a tricky, dishonorable, unscrupulous and conscienceless man; that ... Myers had stated in effect that he intended to do everything in his power to beat [Hodges] out of the money owing to him, short of swearing to a lie.” Id. at 358. The complaint was filed with the clerk of the circuit court and was signed and sworn to by Hodges. Id. at 363. The trial court later struck the defamatory language from the complaint as being impertinent, irrelevant, immaterial, and scandalous. Id.
Myers sued Hodges for libel in a separate action based upon the above statements, but the trial court entered a final judgment in Hodges’ favor. See id. at 359. On appeal, after surveying numerous English cases and cases from the United States, this Court adopted the “overwhelming” rule across the country that an absolute privilege applies to statements published in the course of judicial proceedings, but only when those statements are “connected with, or relevant or material to, the cause in hand or subject of inquiry.” Id. at 361. The Court’s stated rationale for this policy was as follows:
In coming to this conclusion, we are not unmindful of the weighty reasons advanced in favor of the English doctrine of absolute privilege for defamatory words published in the course of judicial proceedings^ which does not require a relevancy component]; that it is to the interest of the public that great freedom should be allowed in complaints and allegations with a view to have them inquired into; and that parties and counsel should be indulged with great latitude in the freedom of speech in the conduct of their causes in courts and in asserting their rights, because in this way the purposes of justice mil be subserved, and the court can and will protect the party aggrieved by expunging irrelevant defamatory matter from the pleadings, and by punishing for contempt of court the guilty party. We think the ends of justice will be effectually accomplished by not extending the privilege so far as to make it an abso *1213 lute exemption from liability for defamatory words wholly and entirely outside of, and having no connection with, the matter of inquiry. For why should a person be absolutely privileged to defame another in the course of a judicial proceeding by making slanderous statements wholly outside of the inquiry before the court? We think it unnecessary to carry the doctrine so far. The ends of justice can be effectually accomplished by placing a limit 'upon the party or counsel who avails himself of his situation to gratify private malice by uttering slanderous expressions and making libelous statements, which have no relation to, or connection with, the cause in hand or the subject-matter of inquiry. The person whose good name suffers has, or ought to have, the right to vindicate his reputation by an appeal to the courts, instead of taking the law into his own hands. The law would be a vain thing indeed to shut the gates of justice in his face, and at the same time fetter his hands by the command: ‘Thou shalt not kill.’ The person accused may have suffered great financial loss by the slander published under the protection of the law, and the only compensation or consolation he would have would be the indulgence in the reflection that the court had enriched the public treasury with a fíne collected from his defamer.
Id. at 361-62 (emphasis added).
Through its adoption of the absolute privilege, the Court in Myers thus made two critical observations. First, a court can and will protect the aggrieved party by expunging defamatory statements from the pleadings and punishing the defamer with contempt of court. Second, the absolute privilege would not extend to statements sharing “no relation to, or connection with, the cause in hand or the subject-matter of inquiry.” Id. at 362.
As to this latter observation, the Court held that “much latitude must be allowed to the judgment and discretion of those who maintain a cause in court” when “determining what is pertinent.” Id. The policy behind allowing wide latitude was to account for “the earnest though mistaken zeal of a litigant who seeks to redress his wrongs and for the ardent and excited feelings of the fearless, conscientious lawyer, who must necessarily make his client’s cause his own.” Id. Where defamatory statements were not pertinent to the cause at hand, but were still published in the course of a judicial proceeding, the Court in Myers held that rather than recognizing no privilege at all, a qualified privilege instead would apply. Id. at 363. According to the Court, this qualified privilege could be overcome by the plaintiff’s showing of express malice. Id. The Court ultimately determined it was the qualified privilege that would apply to the facts of that case because the trial court had stricken the “defamatory matter” contained in the complaint as being irrelevant to the underlying suit. See id.
These broad principles of law from Myers outlining the contours of Florida’s absolute privilege have since been reaffirmed by this Court on a number of occasions.[2] In Robertson v. Industrial Insur *1214 ance Co., 75 So.2d 198, 199 (Fla.1954), for example, the Court addressed whether the absolute privilege adopted in Myers should extend to quasi-judicial proceedings before an administrative officer. The Court resolved this issue in the affirmative, a holding buttressed by the policy that persons connected to judicial proceedings should be free from fear of defending lawsuits emanating from their derogatory disclosures to quasi-judicial agencies. The Court stated as follows:
The grounds upon which the rule of absolute privilege is sustained as to judicial proceedings is that all persons connected with the proceedings should be free from fear of being called upon to defend suits arising as a result of derogatory disclosures, and that to permit such suits would result in a circuity of actions by which the same issues tried in the judicial proceedings could be retried. These grounds applicable to purely judicial proceedings apply with equal force to a proceeding requiring the exercise of ‘pure judicial power, ’ such as the proceeding here involved.
Id. at 200 (emphasis added).
Our recognition of the absolute privilege in this context was premised on two concerns: (1) that the initial trial would needlessly devolve into another trial; and (2) that the potential exposure to a subsequent lawsuit would have a chilling effect on litigants seeking to redress their injuries. Indeed, our most recent discussion of the privilege in Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 950 So.2d 380, 383 (Fla.2007), characterized Myers as establishing “the principle of the litigation privilege in Florida, essentially providing legal immunity for actions that occur in judicial proceedings.”
Notwithstanding the continued vitality of Florida’s absolute privilege as first recognized in Myers, this Court’s construct of that privilege has also evolved over time. Most notably, in Fridovich v. Fridovich, 598 So.2d 65 (Fla.1992), the Court narrowed the scope of the absolute privilege, recognizing that not all statements made outside of the formal judicial process should be subject to an absolute privilege. In that case, the Court receded from the broad holdings set forth in Ange v. State, 98 Fla. 538, 123 So. 916 (1929), and Robertson that any defamatory statement made preliminary to a judicial proceeding, but that is still related to the proceeding, should be absolutely protected. Fridovich, 598 So.2d at 69.
In Fridovich, after Edward Fridovich shot and killed his father, the police concluded that the shooting was accidental and filed no charges. Id. at 66. Edward’s brother, Anthony, then initiated a conspiracy among family members to have Edward charged for the intentional killing of their father. Id. Anthony purchased a stress analyzer to determine which conspirator would be the most convincing deceiver, after which Anthony’s sister and her ex-husband were selected to make *1215 false statements to encourage the authorities to reopen the investigation. Id. Consequently, the investigation was reopened, Edward was indicted for first-degree murder, and he was eventually convicted of the lesser charge of manslaughter. Id. After the trial, the sister and her ex-husband recanted their statements and admitted the falsity of their trial testimony. Id.
Edward filed an action against Anthony and the other conspirators for defamation and other claims. Id. The trial court dismissed the complaint, and the Fourth District affirmed in part but certified the following question to this Court: “Are statements made by a private individual to an investigating officer or a prosecutor' preliminary to the filing of a criminal charge absolutely privileged so as to avoid liability for defamation even when the statements are false and made with actual malice?” Id. This Court answered the certified question in the negative, holding that the scope of the absolute privilege should be narrowed and finding that the “egregious facts” of that ease made an “eloquent argument for adopting a qualified privilege” and for receding from Ange and Robertson to the extent those cases were inconsistent with the Court’s decision. See id. at 66, 68.
In reaching this conclusion, the Court discussed the policy behind immunity from suit, distinguishing between the circumstances that surround the instigation of the filing of criminal charges and those that involve formalized judicial proceedings:
Although not entirely responsive to the general policy underlying the absolute privilege, we note, as the New Jersey and California courts have noted, that in formal judicial proceedings “the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is renewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions.” Dijkstra v. Westerink [168 N.J.Super. 128], 401 A.2d 1118, 1121 (quoting Rainier’s Dairies v. Raritan Valley Farms, Inc. [19 N.J. 552], 117 A.2d 889, 894 (N.J.1955)), certification denied, [81 N.J. 329], 407 A.2d 1203 (N.J.1979); see Fenelon v. Superior Court [223 Cal.App.3d 1476], 273 Cal.Rptr. 367, 370-71 (1990). These safeguards are not present when citizens make statements to the authorities involving alleged criminal activity.
Fridovich, 598 So.2d at 69 n. 5 (emphasis added). In other words, when weighing whether to apply the absolute privilege to that factual scenario, the Court considered that the “safeguards” arising from the “comprehensive control exercised by the trial judge whose action is renewable on appeal” and the availability of other remedies through which the trial court could mitigate the harm were not present at the time citizens make statements to the authorities before the filing of criminal charges. Id.
Absent these safeguards, the Court in Fridovich reasoned that a qualified, rather than an absolute, privilege was sufficiently protective of those wishing to report events concerning crime and balanced society’s interest in detecting and prosecuting crime with a defendant’s interest in not being falsely accused. Id. at 69. To overcome a qualified privilege, the Court further held, a plaintiff must “establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice— i.e., that the defendant’s primary motive in making the statements was the intent to injure the reputation of the plaintiff.” Id.
*1216 Shortly after Fridovich, this Court issued its decision in Levin, which reaffirmed the applicability of Florida’s absolute privilege as it applies to conduct occurring during the course of judicial proceedings. Levin, 639 So.2d at 608-09. In Levin, an insurance company, Morrison Assurance (Morrison), filed an underlying bad faith action against another insurance company, United States Fire Insurance Company (United). Id. at 607. Morrison listed its counsel, Lefferts L. Mabie, as an individual who had knowledge of the alleged bad faith of United. Id. United moved to disqualify Mabie and his firm (the Levin firm), certifying to the trial court that it would call Mabie as a witness during trial. Id. The trial court disqualified Mabie and his firm from serving as counsel for Morrison. Id. United never subpoenaed Mabie for trial, did not call him as a witness, and failed to notify the trial court that it would not call him as a witness. Id. A final judgment was entered in favor of Morrison for over $600,000. Id. Due to the disqualification, Mabie and the Levin firm lost the contingency fee they would have received had they been allowed to represent Morrison in the bad faith action. Id.
The Levin firm subsequently sued United in federal district court for tortious interference with a business relationship. Id. The firm alleged that United intentionally disqualified Mabie to prevent the Lev-in firm from representing Morrison. Id. The federal district court dismissed the action based on the absolute privilege. Id. On appeal, finding it was unclear whether Florida courts extend the privilege to a claim of tortious interference with a business relationship, the Eleventh Circuit Court of Appeals certified that question to this Court. Id. This Court answered in the affirmative, holding that the privilege did apply. As it had done previously, the Court balanced the right of an individual to enjoy a reputation free from defamatory attacks against the right of the public interest to unhampered disclosure of facts in the course of judicial proceedings:
This absolute immunity resulted from the balancing of two competing interests: the right of an individual to enjoy a reputation unimpaired by defamatory attacks versus the right of the public interest to a free and full disclosure of facts in the conduct of judicial proceedings. In determining that the public interest of disclosure outweighs an individual’s right to an unimpaired reputation, courts have noted that participants in judicial proceedings must be free from the fear of later civil liability as to anything said or written during litigation so as not to chill the actions of the participants in the immediate claim. Although the immunity afforded to defamatory statements may indeed bar recovery for bona fide injuries, the chilling effect on free testimony would seriously hamper the adversary system if absolute immunity were not provided.
[[Image here]]
In balancing policy considerations, we find that absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior such as the alleged misconduct at issue, so long as the act has some relation to the proceeding. ... Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct.
Id. at 608 (emphasis added) (citations omitted). Importantly, the Court concluded by noting that adequate remedies would still exist for misconduct occurring during judi *1217 cial proceedings, including the trial court’s contempt power as well as the disciplinary measures of the state court system and the bar association. See id. at 608-09.
II. The Scope of Florida’s Absolute Privilege
Based on a review of the history of the absolute privilege in Florida and the purpose served by the doctrine, Myers and its progeny firmly establish a unifying concept: this Court’s recognition of the privilege derived from a balancing of two competing interests — the public interest in allowing litigants and counsel to freely and zealously advocate for their causes in court versus protecting the rights of individuals, including the right of an individual to maintain his or her reputation and not be subjected to slander or malicious conduct. Where this balance fell was often dependent upon the safeguards in place that served to provide real and immediate checks to abusive and overzealous practices — that is, how far removed those practices were from protections of the formalized judicial process that would serve to counteract the occurrence and consequences of defamatory statements or abuse.
In cases where this Court has applied the absolute privilege to issues involving defamation, the defamatory statements at issue were made either in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body. In these more formalized judicial settings, the presence of safeguards facilitates and promotes an unimpeded speaking environment while protecting an individual from false or malicious statements for several reasons. First, the alleged defamatory statements giving rise to the action are memorialized before a judicial officer, minimizing concerns of factual dispute. Second, the potential harm that may result can be “mitigated by ... formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions.” Fridovich, 598 So.2d at 69 n. 5 (quoting Dijkstra, 401 A.2d at 1121). Third, the trial court “can and will protect the party aggrieved by expunging [or striking] irrelevant defamatory matter from the pleadings, and by punishing for contempt of court the guilty party.” Myers, 44 So. at 361. And finally, the “trial judge has the inherent power to do those things necessary to enforce its orders, to conduct its business in a proper manner, and to protect the court from acts obstructing the administration of justice.” Levin, 639 So.2d at 608-09.
This same rationale would apply with like force to depositions properly noticed under the Florida Rules of Civil Procedure, at which the opposing side is present. Cf Anderson v. Shands, 570 So.2d 1121, 1122 (Fla. 1st DCA 1990) (holding that the taking of a deposition is considered part of a judicial procedure for the purpose of applying an absolute privilege against civil liability). During depositions, a protection against abuse exists simply because the proceeding is adversarial in nature and the opposing side has an opportunity to immediately object to any untrue statements. Moreover, if statements are falsely made, the harmed party may seek to impose sanctions against the offending party in an expeditious way, with the transcript of the deposition providing a clear record of proof. Further, the trial court can thereafter strike the defamatory matter from the record.
In contrast to the panoply of judicial oversight protections envisioned by our precedent ranging from Myers to Levin, which promote the free flow of informa *1218 tion, these safeguards are either unavailable or far less effective where, as in this case, the alleged defamatory statements are made by an attorney to a nonparty witness during an out-of-court, informal investigation, which may take place without a recording or outside the presence of the opposing party or counsel. Indeed, one problem with ex-parte, out-of court, informal investigations is that no formal record arises out of the transaction, which may create a dispute regarding what was even said, as is the case here. Absent safeguards, the value of the absolute privilege as a mechanism for discovering truth decreases while the potential for damage to a person’s reputation increases.
This shift creates an unacceptable imbalance among these competing interests, heightening concerns for abuse. Judge Warner persuasively articulated this concern in her dissent in the decision below:
If the purpose of absolute immunity is to preserve the attorney and party’s right to present their case at trial without fear of intimidation, I do not think that policy is advanced by protecting a lawyer who is defaming a party to a witness outside of a proceeding at a time when both parties are not present and do not have an opportunity to be heard. In fact, rather than enhance the truth-seeking function of trials, such conduct as alleged here may taint the entire process by influencing witnesses with false and defamatory information about the adversary. This case serves as an example.... If the attorney had made statements at a deposition, at least Del-Monico’s attorney could have been present to object. As it is, the witness hears defamatory information regarding Del-Monico from a member of a respected law firm. DelMonico has no protection from such damaging falsehoods when uttered essentially in secret.
DelMonico, 50 So.3d at 12 (Warner, J., dissenting).
Based on these considerations, we conclude that in situations like the one present here, where an attorney steps outside of both the courtroom and the formal discovery process to investigate a claim, this Court’s precedent does not support an extension of the absolute privilege. Certainly, the ultimate purpose of the judicial process is to determine the truth, and an attorney’s informal method of discovery is an inherent and important part of this process. However, in balancing the interests at stake, and taking full account of the role informal investigation plays in ongoing litigation, we conclude that Florida’s absolute privilege was never intended to sweep so broadly as to immunize an attorney from liability for alleged defamatory statements the attorney makes during ex-parte, out-of-court questioning of a potential, nonparty witness in the course of investigating a pending lawsuit.
Without the aforementioned protective measures, we conclude that only a qualified privilege should apply to statements made by attorneys as they undertake informal investigation during pending litigation and engage in ex-parte, out-of-court questioning of nonparty witnesses, “so long as the statements are relevant to the subject of inquiry” in the underlying suit. Levin, 639 So.2d at 607. The competing public policies of safeguarding a plaintiffs reputation and ensuring full disclosure in a judicial proceeding are better served in this circumstance by a qualified privilege. As Judge Warner cogently explained:
Just as in Fridovich, that standard would deter frivolous lawsuits as it would require the plaintiff to prove both that the statements were false and that they were made with express malice, i.e., “that the defendant’s primary motive in *1219 making the statements was the intent to injure the reputation of the plaintiff.” 598 So.2d at 69. But it would also deter participants in the investigatory process outside judicial proceedings from intentionally harming their adversary with impunity.
DelMonico, 50 So.3d at 12 (Warner, J., dissenting).
In reaching this conclusion, we underscore that the protective cloak of a qualified privilege should never be meant to immunize statements when made by an attorney during ex-parte, out-of-court questioning of a potential, nonparty witness in the course of investigating a pending lawsuit if those statements are not connected with or related to the subject of inquiry in the underlying lawsuit. The issue of whether a statement is connected with or related to the subject of inquiry is a threshold determination to be made by a judge, mindful that “much latitude must be allowed to the judgment and discretion of those who maintain a cause in court” when “determining what is pertinent.” Myers, 44 So. at 362; see also Hope v. Nat’l Alliance of Postal & Fed. Emps., Jacksonville Local No. 320, 649 So.2d 897, 901 (Fla. 1st DCA 1995) (noting that “courts have not imposed a strict relevancy test in determining whether a statement made in the judicial process is entitled to immunity” in “recognition of the necessity of providing for the free flow of information”); Restatement (Second) of Torts § 586 cmt. c. (1977) (recognizing that attorney statements made during the course of judicial proceedings “need not be strictly relevant to any issue involved in” those proceedings for the absolute privilege to apply). As Levin expressed the standard of relevancy, the defamatory statement or other tortious behavior is privileged “so long as the act has some relation to the proceeding.” Levin, 639 So.2d at 608 (emphasis added).
Once the trial court is satisfied as a matter of law that the alleged defamatory statements, assuming they were made, are connected with or related to the subject of inquiry in the underlying lawsuit, the defendant to a defamation action is entitled to assert a qualified privilege, placing the burden upon the plaintiff to then prove the additional element of express malice. See Nodar v. Galbreath, 462 So.2d 803, 810 (Fla.1984) (“The privilege ... places upon the plaintiff the burden of proving express malice — that is, malice in fact as defined by the common-law doctrine of qualified privilege.”). Conversely, where the trial court determines that the alleged defamatory statements, assuming they were made, are not connected with or related to the subject of inquiry, then the defendant to a defamation action would be afforded no privilege at all, allowing the plaintiff to proceed with the action absent the burden of having to prove express malice. Applying a qualified privilege in a manner consistent with our pronouncement above properly balances the competing interests of the individual’s right to be protected from false statements with the judicial system’s need in free and open disclosure of facts.
III. This Case
In the underlying defamation suit, the Crespo action, DelMonico alleged that Crespo had told others that DelMonico had supplied the owner of a company doing business with DelMonico’s company with prostitutes in a successful attempt to lure customers away from Crespo. To investigate and defend against this accusation, Crespo’s attorney, Traynor, interviewed DelMonico’s ex-spouses and business associates as potential witnesses outside of both the court and the presence of DelMonico or Del-Monico’s counsel.
*1220 DelMonico and his company, MYD, subsequently filed a new suit against Traynor and Traynor’s law firm, alleging that statements Traynor made during the course of his investigation were defamatory and resulted in the tortious interference with a business relationship. The crux of Del-Monico and MYD’s claims was that Tray-nor had falsely stated to third-party witnesses during ex-parte interviews that DelMonico was being “prosecuted” for using prostitution to get business.
Because Traynor’s alleged defamatory statements were allegedly made during ex-parte, out-of-court questioning of potential, nonparty witnesses in the course of investigating DelMonico’s underlying lawsuit, the trial court should not have granted summary judgment based on the absolute privilege. Rather, as we have held above, Traynor would be permitted to raise the defense of qualified privilege, so long as Traynor’s statements were related to or connected with the subject of inquiry in DelMonico’s underlying lawsuit.
Although the parties dispute the content of Traynor’s statements, for the purposes of determining whether a qualified privilege even applies, we must assume the truth of the statements alleged in the complaint. In view of the fact that the relevancy standard is not to be strictly construed, we agree that Traynor’s statements, as alleged in the complaint, bore a relation to or were connected with the Crespo lawsuit. The subject of the Crespo defamation lawsuit was that Crespo had defamed DelMonico by telling others that DelMonico had hired prostitutes, a criminal activity, to obtain business. Therefore, Traynor’s discussion with prospective witnesses about DelMonico’s alleged use of prostitution was related to the subject of inquiry because Traynor was gathering information about the veracity of the central accusations against his client in the Crespo lawsuit.
Given that Traynor’s statements were relevant, DelMonico and MYD must now overcome the qualified privilege afforded to Traynor and his law firm by establishing express malice. See Fridovich, 598 So.2d at 69. That is, DelMonico and MYD must “establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice — i.e., that the defendant’s primary motive in making the statements was the intent to injure the reputation of the plaintiff.” Id. These factual inquiries must be developed on remand.
CONCLUSION
Based on the foregoing, we hold that Florida’s absolute privilege does not extend to statements made by an attorney during ex-parte, out-of-court questioning of a potential, nonparty witness in the course of investigating a pending lawsuit. In this narrow scenario, a qualified privilege instead applies so long as the defamatory statements are related to or connected with the subject of inquiry in the underlying lawsuit. A qualified privilege requires the plaintiff to prove express malice. We quash the decision below and remand this case for further proceedings consistent with this opinion.
It is so ordered.
QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., dissents with an opinion.
CANADY, J., dissents with an opinion, in which POLSTON, C.J., concurs.

. Counsel for the Plaintiffs also represented that a Florida Bar complaint had been filed against Traynor, but that The Florida Bar had not yet acted upon the complaint due to ongoing litigation.

. See, e.g., State ex rel. Giblin v. Sullivan, 157 Fla. 496, 26 So.2d 509, 515 (1946) (setting forth the rule announced in Myers when discussing the contents of a party’s affidavit appended to a motion to dismiss); Budd v. J.Y. Gooch Co., 157 Fla. 716, 27 So.2d 72, 75 (1946) (noting that "[t]he rule adopted by this court in determining whether or not words employed by a pleader in a judicial proceeding are privileged and not actionable is set forth in the case of Myers ”); Taylor v. Alropa Corp., 138 Fla. 137, 189 So. 230, 231 (1939) (applying absolute privilege on the basis of Myers because “the words appearing in the *1214 pleading ... were relevant and were properly used in connection with the foreclosure proceeding”); Ange v. State, 98 Fla. 538, 123 So. 916, 917 (1929) (citing to Myers and holding that the absolute privilege "as applied to statements made in the course of judicial proceedings is not restricted to trials of actions, but-includes proceedings before a competent court or magistrate in the due course of law or the administration of justice which is to result in any determination or action by such court or officer”); Fisher v. Payne, 93 Fla. 1085, 113 So. 378, 380 (1927) (noting that absolute privilege applied in case where alleged defamatory statements were published in pleadings); Stewart v. Codrington, 55 Fla. 327, 45 So. 809, 812 (1908) (recognizing that the question of whether defamatory words published in the due course of a legal procedure were libelous was considered by this Court in Myers).