# Third District Court of Appeal

## State of Florida

Opinion filed October 18, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1689
Lower Tribunal No. 13-19894
_____

**Arko Plumbing Corp., a Florida Corporation,**
Appellant,

vs.

**Michael P. Rudd, Esq. and Rudd & Diamond, P.A.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, John W. Thornton, Judge.

Weil Quaranta, P.A., Ronald P. Weil, John M. Quaranta, and Marguerite Snyder, for appellant.

Rumberger, Kirk, & Caldwell, P.A., M. Stephen Smith, and Michael R. Holt, for appellees.

Before ROTHENBERG, C.J., and SCALES and LUCK, JJ.

LUCK, J.

Under Florida's absolute litigation privilege, a defendant can slander the plaintiff and lie to her and the court, and still be absolutely immune from a later

lawsuit for defamation, tortious interference with a business relationship, and even violations of federal consumer protection statutes, as long as the slander and lies were made in the courtroom or during the formal discovery process and had some relation to the case. The trial court in this case extended the absolute privilege to (1) the defendants accessing the plaintiff's password-protected vehicle tracking system, and (2) their questions to the plaintiff's customers during an examination under oath, and granted summary judgment for the defendants. We agree with the plaintiff that the absolute privilege cannot be stretched that far, reverse summary judgment, and remand to the trial court.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

In 2010, plaintiff Arko Plumbing Corporation was providing homeowners with "video colonoscopies" of their cast-iron drain pipes to locate cracks in the damaged pipes. Arko would identify the cracks, assist homeowners in filing claims under their insurance policies, and then replace the damaged cast-iron pipes (an expensive fix which required digging through a home's flooring into the concrete pad to remove the old, damaged pipes).

Bascuas v. Citizens Property Insurance Corp. Defendants Michael Rudd and his law firm, Rudd & Diamond, P.A., represented insurance companies on claims that they breached homeowner's insurance policies by not covering Arko's repairs to the homeowners' damaged pipes. In 2013, Rudd and his firm were

2

defending Citizens Property Insurance Corporation in the breach of property insurance case brought by the Bascuases. On February 26 and 27, 2013, Rudd and his firm, with the help of a former Arko employee, John Collucci, used Collucci's still-active password to access Arko's MotoMon Global Positioning System account. MotoMon is an internet-based computer program which provided historical and real-time access to the location of Arko's service vans. On the MotoMon program, Rudd and his firm, with Collucci's password, accessed the historical location information for eighteen Arko clients, including the Bascuases. Rudd and his firm then issued subpoenas to Arko for its Motomon information, including information related to location of Arko service vans at the Bascuas residence.

Calejo v. State Farm Florida Insurance Co. In March 2013, Rudd and his firm also defended State Farm Florida Insurance Company in the breach of homeowner's policy claim filed by the Calejos. The Calejos insurance policy with State Farm required that they answer the company's questions at an examination under oath. The examination was held on March 8, 2013, and included the following exchange:

> Rudd: Did you have any kind of – and I think we talked about this, but you never met with anybody at Arko at any time before this loss, right?

Ms. Calejo: No sir, not that I recall. I know I've called plumbers before but I don't think that he was one of the ones that ever came to my house.

Rudd: So, he didn't come out to y'all about a year in advance and say you need to clean this house up before we can make an insurance claim?

Ms. Calejo: Oh, my God, no.

Rudd: He did not do that?

Ms. Calejo: No . . .

Rudd: And you never met with Joe or anybody associated with Arko at any time in advance of this loss to discuss committing insurance fraud?

Ms. Calejo: Oh, no.

The complaint. Arko filed its fifth amended complaint against Rudd and his firm, and various other defendants, including Citizens, State Farm, Stephen Andris (a State Farm employee), former Arko employee Collucci, and Maria Fonnegra (Collucci's girlfriend). The complaint alleged that Rudd and his firm engaged in: a civil conspiracy with the other defendants (count one); deceptive and unfair trade practices (counts four and five); theft of trade secrets (counts nine and ten); defamation (counts fifteen and sixteen); and intentional interference with business relationships (counts twenty-two and twenty-three).

Summary judgment. By the time of the summary judgment motion in this case, Arko's claims against Rudd and his firm were focused on accessing the

4

MotoMon account in the <u>Bascuas</u> case, and the questions during the examination under oath in the <u>Calejo</u> case. Rudd and his firm moved for summary judgment based, in part, on the litigation privilege and because the information on the MotoMon program was not a trade secret under Florida law. The trial court granted the motion for summary judgment, explaining:

> Okay. As to both Rudd and Rudd & Diamond I do find that whether it's the litigation privilege or the qualified privilege, that it absolutely does apply, including under the facts and circumstances in this case and, therefore, I grant summary judgment across the board for Rudd and Rudd & Diamond in this case.

Arko moved for rehearing on the summary judgment for Rudd and his firm. In denying the rehearing motion, the trial court, again, explained:

> Under the facts of this case, the way the complaint is framed, [Arko's] customer list is not a trade secret. Absolute litigation privilege applies; even if it were only qualified privilege, Arko didn't carry its burden of proving malice as to these defendants.

## STANDARD OF REVIEW

"The standard of review of a summary judgment order is de novo and requires viewing the evidence in the light most favorable to the non-moving party." <u>Sierra v. Shevin</u>, 767 So. 2d 524, 525 (Fla. 3d DCA 2000). Whether the litigation privilege applies to Rudd and his firm's conduct is a pure question of law, and is also reviewed de novo. <u>DelMonico v. Traynor</u>, 116 So. 3d 1205, 1211 (Fla. 2013).

## DISCUSSION

5

Florida's litigation privilege affords absolute immunity "to any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding." Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 950 So. 2d 380, 384 (Fla. 2007) (omission in original) (quoting Levin, Middlebrooks, Mabie, Thomas, Mayes Mitchell, P.A. v. U.S. Fire Ins. Co., 639 So.2d 606, 608 (Fla.1994)). The absolute privilege does not apply "where an attorney steps outside of both the courtroom and the formal discovery process to investigate a claim." DelMonico v. Traynor, 116 So. 3d 1205, 1218 (Fla. 2013). Instead, a "qualified privilege" applies "to statements made by attorneys as they undertake informal investigation during pending litigation and engage in ex-parte, out-of-court questioning of nonparty witnesses, 'so long as the statements are relevant to the subject of inquiry' in the underlying suit." Id. (quoting Levin, 950 So. 2d at 607). If the court determines that the qualified privilege applies, the burden is on the plaintiff to "prove the additional element of express malice." Id. at 1219.

Arko contends the trial court erred in granting summary judgment for Rudd and his firm because: the litigation privilege did not apply to accessing Arko's MotoMon account and the examination under oath; even if it did, Rudd and the firm acted with express malice, thereby overcoming the qualified privilege; and the information in Arko's MotoMon account was a trade secret, and thus, subject to Florida's trade secret act. Arko's appeal raises three issues: (1) does the litigation

6

privilege extend to Rudd and his firm's accessing Arko's MotoMon account (no); (2) does the absolute or qualified privilege apply to Rudd's questions at the examination under oath (qualified); and (3) was the information on Arko's MotoMon account a trade secret (yes).

### 1. Does the litigation privilege extend to Rudd and his firm's accessing Arko's MotoMon account?

While the absolute and qualified litigation privilege applies to statements and acts that have some relation to a judicial proceeding, a review of the Florida Supreme Court's litigation privilege decisions shows that the statements and acts must be communicative. Every Florida Supreme Court decision that has applied the privilege has done so where the statement was made or act was done while communicating during a pending case or as part of an investigation.

In Myers v. Hodges, 44 So. 357 (1907), the Florida decision adopting the litigation privilege, the privilege was applied to a civil complaint alleging the president of a corporation was "a tricky, dishonorable, unscrupulous and conscienceless man." Id. at 358 (quoting from the complaint). In Fridovich v. Fridovich, 598 So. 2d 65 (Fla. 1992), the privilege was applied to statements made to law enforcement officers, so the officers would falsely charge a family member with murder. Id. at 66. In Levin, the Court applied the privilege to an insurance company's attorney who falsely certified that opposing counsel would be a witness in the case. Levin, 639 So. 2d at 607. In Echevarria, the Court applied the

7

privilege to letters sent by a law firm to defendants in foreclosure cases that falsely represented the amount of money the defendants owed for title searching services. Echevarria, 950 So. 2d at 381. And in DelMonico, the Court applied the qualified privilege to false statements about one of the parties made during informal interviews with potential witnesses in an ongoing litigation. DelMonico, 116 So. 3d at 1209.

In each of these litigation privilege cases, the privilege was applied to communications made to another (the court, parties, law enforcement officers, and witnesses) during an investigation or as part of judicial proceedings. Whatever the cause of action (defamation, consumer protection act violations, tortious interference), the litigation privilege protected communications that had some relationship to a pending case.

While the Florida Supreme Court has not explicitly distinguished between communicative and noncommunicative acts in discussing the litigation privilege, the distinction is reflected in the Court's stated purpose for the privilege.

> [I]t is to the interest of the public that great freedom should be allowed in complaints and allegations with a view to have them inquired into; and that parties and counsel should be indulged with great latitude in the freedom of speech in the conduct of their causes in courts and in asserting their rights, because in this way the purposes of justice will be subserved . . . .

Id. at 1212 (quoting Myers, 44 So. at 361). The privilege derived in part from "the public interest in allowing litigants and counsel to freely and zealously advocate

8

for their causes in court." Id. at 1217. The litigation privilege's purpose, that is, is to protect courtroom speech and advocacy – the communicative tools lawyers, litigants, and witnesses use to search for the truth in our adversarial justice system.

Other states have explicitly distinguished between communicative and noncommunicative conduct. The California Supreme Court has explained that "the litigation privilege protects only publications and communications," and the "threshold issue in determining the applicability of the privilege is whether the defendant's conduct was communicative or noncommunicative." Rusheen v. Cohen, 128 P.3d 713, 719 (Cal. 2006) (quotation omitted). Other states also have stressed that the litigation privilege applies only to acts or statements that are "communications." See, e.g., Greenberg Traurig v. Frias Holding Co., 331 P.3d 901, 902 (Nev. 2014) ("[T]he litigation privilege immunizes from civil liability communicative acts occurring in the course of judicial proceedings, even if those acts would otherwise be tortious."); Morgan & Pottinger, Attorneys, P.S.C. v. Botts, 348 S.W.3d 599, 602 (Ky. 2011) (as modified on rehearing) ("A communication must fulfill two requirements in order to fall within the ambit of the judicial statements privilege. First, the communication must have been made preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of a judicial proceeding. Second, the communication must be material, pertinent, and relevant to the judicial proceeding." (quotation and

9

citations omitted)); <u>Hawkins v. Harris</u>, 661 A.2d 284, 289 (N.J. 1995) ("The absolute privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (quotation omitted)); <u>Hopkins v. O'Connor</u>, 925 A.2d 1030, 1037 (Conn. 2007) ("[C]ommunications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (quotation omitted)); <u>Reagan v. Guardian Life Ins. Co.</u>, 166 S.W.2d 909, 912 (Tex. 1942) ("Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel.").

In California, for example, the privilege has not been extended to the unlawful recording of telephone conversations because recording another person without that person's permission is noncommunicative conduct. <u>See</u> <u>Kimmel v. Goland</u>, 793 P.2d 524, 527-30 (Cal. 1990). For the same reason, the privilege has not been applied to hang-up telephone calls and slashed tires because they were not communications. <u>See</u> <u>Martel v. Litchfield</u>, No. C068425, 2013 WL 6260376, at *4-5 (Cal. Ct. App. Dec. 4, 2013).

10

Here, too, Rudd accessing Arko's MotoMon account on his law firm computer was a noncommunicative act. Just as sneaking into an old friend's house to look at the books in his library doesn't communicate anything to the friend, accessing the account using Collucci's password did not communicate information to another person. Rudd didn't write pleadings (Myers and Levin) or letters (Echeverri); and he didn't make false statements to the police (Fridovich), defendants (Echeverri), or during an interview of potential witnesses (DelMonico). Rudd, according to the summary judgment evidence, was looking for information about Arko to use against homeowners in pending insurance cases. Rudd and his firm were gathering information from the MotoMon system – they were not trying to communicate a thought, idea, or issue to another person.

Without a communicative act, Rudd and his firm's actions fall outside what the Florida Supreme Court has held as protected by the litigation privilege. We conclude that Rudd's sitting at his computer and accessing Arko's MotoMon account was not a communication subject to the privilege.

### 2. Does the absolute or qualified privilege extend to Rudd's questions at the examination under oath?

Rudd's questions to Ms. Calejo during the examination under oath were communications. Rudd contends they should be considered part of the formal discovery process, and therefore, subject to the absolute litigation privilege. Arko responds that the examination under oath is not part of the formal discovery

process, and the qualified privilege should apply. The difference matters because under the qualified privilege Arko must show a genuine issue of material fact that Rudd asked the questions with express malice, that is, Rudd's primary motive in asking the questions was to injure Arko's reputation. DelMonico, 116 So. 3d at 1219. For the absolute privilege, there's no need to prove malice because "the formalized judicial process . . . serve[s] to counteract the occurrence and consequences of defamatory statements or abuse." Id. at 1217.

Rudd analogizes examinations under oath to witness depositions authorized by the rules of civil procedure. Because the Florida Supreme Court has described civil procedure depositions to be inside the formal discovery process, and examinations under oath are deposition-like, the argument goes, they too should be considered part of the formal discovery process. True, the Florida Supreme Court cited "depositions properly noticed under the Florida Rules of Civil Procedure" as an example of a judicial proceeding having "safeguards in place that served to provide real and immediate checks to abusive and overzealous practice." Id. at 1217. Civil procedure depositions, the Court explained, have "protections of the formalized judicial process" because:

- they are "adversarial in nature and the opposing side has an opportunity to immediately object to any untrue statements";

12

- "if statements are falsely made, the harmed party may seek to impose sanctions against the offending party in an expeditious way, with the transcript of the deposition providing a clear record of proof"; and

- "the trial court can thereafter strike the defamatory matter from the record."

Id. Also, civil procedure depositions are limited to relevant information as defined by the rules of civil procedure, and the trial court has discretion to videotape the deposition and appoint a special master to preside over it as protections to the parties. See Fla. R. Civ. P. 1.280(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter of the pending action . . . ."); id. R. 1.280(c)(2) ("Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense that justice requires, including . . . that the discovery may be had only on specified terms and conditions . . . .").

To be sure, an examination under oath has some of these protections, including having opposing counsel present at the examination, but even then "an insured's counsel plays a different role during examinations under oath than during depositions." Goldman v. State Farm Fire Gen. Ins. Co., 660 So. 2d 300, 305 (Fla.

4th DCA 1995).  An examination under oath does not have a mechanism for a defamed party to seek to impose sanctions in an expeditious way, and there is no process to strike the defamatory matter from the record.  There is no legal limitation on the scope of the examination, and a party concerned about harassment cannot get protection in advance like at a civil procedure deposition.  The safeguards that protect a party from harm in a civil deposition are not there for an examination under oath.

The absolute privilege, the Florida Supreme Court has explained, is part of a tradeoff.  The absolute privilege was created to encourage zealous representation and the free and full discovery of facts between the parties and the court.  See DelMonico, 116 So. 3d at 1216 ("This absolute immunity resulted from the balancing of two competing interests: the right of an individual to enjoy a reputation unimpaired by defamatory attacks versus the right of the public interest to a free and full disclosure of facts in the conduct of judicial proceedings.").  In exchange, the parties subject themselves to the consequences if they cross the line: striking from the record scurrilous accusations; sanctions; and even criminal contempt.  The civil procedure deposition fits snuggly within this balance.

Examinations under oath do not.  There is no judge or neutral third-party to strike defamatory statements; there is nowhere to seek sanctions for abusive conduct at the examination; and there is no threat of contempt with the power of

14

the state behind it. There are not the "real and immediate checks to abusive and overzealous practices" that the Florida Supreme Court requires in exchange for the full protections of the absolute privilege. Id. at 1217. We conclude that an examination under oath is outside the formal discovery process, and therefore, does not support an extension of the absolute privilege.

But that doesn't end the inquiry. While the absolute privilege does not apply, the qualified privilege does because Rudd's questions to Ms. Calejo were part of the informal investigation during pending litigation and had some relation to the Calejos lawsuit against the insurance company. See id at 1218 ("Without the aforementioned protective measures, we conclude that only a qualified privilege should apply to statements made by attorneys as they undertake informal investigation during pending litigation and engage in ex-parte, out-of-court questioning of nonparty witnesses, so long as the statements are relevant to the subject of inquiry in the underlying suit." (quotation omitted)). The Calejos' breach of insurance policy claim was pending at the same time as the examination under oath, and Arko's alleged fraud was part of the insurance company's defense.

The trial court found that even if the qualified privilege applied to Rudd and his firm's conduct, Arko presented no summary judgment evidence that Rudd acted with express malice. We disagree.

15

Rudd's questions to Ms. Calejo about Arko committing fraud were based on the information provided by Arko's former employee Collucci. Arko presented summary judgment evidence that public records showed Collucci was a heroin addict and on probation; Rudd knew that Collucci had been fired for taking illegal public adjuster commissions and wanted revenge against Arko and its management; Rudd knew that former employee Collucci used his password to access Arko's MotoMon account and gave the password to Rudd to use; Rudd knew that Collucci lied under oath about accessing the MotoMon account; attorneys representing insurance companies paid Collucci for investigating Arko and testifying against them in homeowners insurance cases; and Rudd sued Arko for racketeering.

Rudd argues that this evidence shows he was motivated to gather information for his firm's defense of its insurance company clients. That is certainly one inference, and it may be the correct one. But at the summary judgment stage, all reasonable inferences from the evidence are made in favor of the non-moving party – in this case, Arko. A reasonable juror could also infer that Rudd's reliance on a former employee with an ax to grind against Arko, who lied under oath, had a knowable drug problem, and was paid for his testimony, was circumstantial evidence of express malice.

Express malice "may be established indirectly, i.e., 'by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.'" McCurdy v. Collis, 508 So. 2d 380, 382 (Fla. 1st DCA 1987) (quoting S. Bell Tel. & Tel. Co. v. Roper, 482 So. 2d 538, 539 (Fla. 3d DCA 1986)). "Where," as here, "the circumstances surrounding the statement are in dispute, the question of qualified privilege is a factual determination for resolution by the jury." Id.; see also id. at 385 ("Since we recognize the difficulties involved in determining whether malice was the [primary] motivating factor in this interference case, we conclude the qualified privilege issue should be resolved by the trier of fact.").

In McCurdy, the Exxon Corporation relied on the testimony of a doctor to tell an employee's supervisor that the employee was not safely able to work on Exxon property. Id. at 381-82. Exxon, when sued (as Arko did) for tortious interference with a business relationship, claimed the qualified privilege applied to its statements to the supervisor. The first district concluded that there was evidence of Exxon's express malice because "the record indicate[d] that Exxon personnel based their decision that [the employee] was a safety risk on the basis of third party reports concerning Dr. Johnson's trial testimony," the company

17

"conducted no independent investigation of [the employee's] job performance, and in fact his employers advised Exxon that [the employee] was doing a good job." Id. at 384; see also Corp. Fin., Inc. v. Principal Life Ins. Co., 461 F. Supp. 2d 1274, 1294 (S.D. Fla. 2006) ("Plaintiffs have produced sufficient circumstantial evidence . . . from which a reasonable jury could find that Castrillon was the source of the altered information, [and] that he was motivated by an intent to injure Plaintiffs . . . ."). There was a factual dispute about Exxon's motive because it had contrary information about the employee's ability to work and did not investigate.

Here, too, Rudd and his firm based their examination under oath questions on what Collucci shared with them. Rudd, as did Exxon, knew of conflicting information about Collucci's credibility, including that he left Arko on bad terms, had lied under oath, and had been promised payment for his testimony, and did not investigate Collucci's criminal background, including that he was on probation and had abused heroin. Still, Rudd used Collucci's information to ask an Arko client about Arko's fraud. Because the surrounding circumstances of the examination under oath lead to competing inferences about Rudd's motive, as in McCurdy, the question of express malice was a genuine disputed fact for the jury.

### 3. Was the information Rudd accessed on the MotoMon account Arko's trade secrets?

18

The trial court also granted summary judgment for Rudd and his firm on Arko's trade secret act claim because the information that was accessed on the MotoMon account was not a protected trade secret. A trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 688.002(4), Fla. Stat. (2017). Arko's summary judgment evidence created a genuine issue of material fact that the information on the MotoMon account was a trade secret.

Customer information has been held to be a trade secret. See, e.g., Sea Coast Fire, Inc. v. Triangle Fire, Inc., 170 So. 3d 804, 808 (Fla. 3d DCA 2014) ("Examples of trade secrets include confidential business information such as a customer list, when the list is not just a compilation of information readily available to the public, but rather acquired or compiled through the owner's industry."); Delucca v. GGL Indus., Inc., 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) ("[W]e find competent substantial evidence that some of the information given out by appellant, which included information about customers which was not available from other sources, constitutes trade secrets under Chapter 688."). Here,

19

the summary judgment evidence showed that Arko had a GPS tracking device on each of its trucks. The MotoMon program linked up to the GPS tracking devices to capture in real time the customers and potential customers that Arko trucks visited to provide plumbing services and video colonoscopies. Customer addresses, the date Arko trucks visited the customer, and the length of time the truck was at the customer's home was available on the MotoMon program.

This information, according to the summary judgment evidence, would have been valuable to Arko competitors because with it they could have solicited Arko customers and offered plumbing services that undercut Arko's prices. To avoid that from happening, Arko kept this information from its competitors and the public by requiring a password to access the MotoMon program. Only two Arko managers had passwords (one of which was Collucci). And Arko signed an agreement with MotoMon that it would not provide information to third persons about the location of Arko vehicles. These are the sorts of reasonable efforts to maintain secrecy required by the trade secret statute. See Heralds of Gospel Found., Inc. v. Varela, No. 17-22281-CIV, 2017 WL 3868421, at *5 (S.D. Fla. June 23, 2017) (concluding under Florida's trade secret act that "Plaintiffs have also likely taken more than reasonable measures towards safeguarding the confidentiality of their Trade Secret Information, including but not limited to, requiring the recipients of digital files containing the Videos to execute NDAs,

20

restricting access to these digital files with password encryption, and limiting exposure of the Videos to distinct members of the Association and the Heralds."); Infinite Energy, Inc. v. Chang, No. 1:07-CV-23-SPM/AK, 2008 WL 11344672, at *2 & n.1 (N.D. Fla. Jan. 9, 2008) (finding customer lists protected trade secrets under Florida's trade secret act in part because "Plaintiff did maintain the lists on password protected computers, maintained a secure computer network, and contracted with Defendant to maintain confidentially regarding trade secrets").

## CONCLUSION

For these reasons, we reverse the summary judgment entered in favor of Rudd and his firm, and remand for further proceedings consistent with this opinion. We express no opinion on other grounds raised in Rudd and his firm's summary judgment motion that were not addressed by the trial court in its orders, and the parties in this appeal.

Reversed and remanded.