IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

LOUIS SPAGNUOLO, JAY LEWIS FARROW,
AND FARROW LAW, P.A.,,

      Appellants,

  v.

INSURANCE OFFICE OF AMERICA, INC.,
JOHN K. RITENOUR, HEATH RITENOUR,
ROY CASWELL, AND J. DAVID NAUGHTON, IV,

      Appellees.

_____/

Case Nos.  5D21-1324
                 5D21-1326
LT Case No. 2020-CA-000725

Opinion filed February 28, 2023

Nonfinal Appeal from the Circuit Court
for Seminole County,
Susan Stacy, Judge.

Holiday Hunt Russell, of Holiday
Hunt Russell PLLC, Fort Lauderdale,
for Appellants, Jay Lewis Farrow
and Farrow Law, P.A.

Jay Lewis Farrow and Meera K.
Koodie, of Farrow Law P.A., Davie,
for Appellant, Louis Spagnuolo.

Brian J. Moran, Christopher R. Parkinson, and Jason DelRosso, of Moran Kidd Lyons Johnson Garcia, P.A., Orlando, for Appellees.

EDWARDS, J.

Appellants seek to vacate a temporary injunction which prohibits them from making or sharing extremely unflattering, possibly defamatory, statements, about some or all Appellees, via email and on social media sites. The injunction also prohibits Appellants' unlicensed use of Appellees' names, logos, and likenesses. Among other topics, the communications from Appellants that led to issuance of the injunction accuse Appellees of various fraudulent, dishonest, unethical, or criminal business conduct regarding Appellees' insurance brokerage firm. For the reasons explained below, we affirm in part, reverse in part, and remand to the trial court for further proceedings.[1]

## Background

### Parties

Appellants include a lawyer, Jay Farrow, and his law firm, Farrow Law, P.A. ("the Farrow Parties"). The other Appellant is Louis Spagnuolo, a client

---

[1] Our rulings only concern the temporary injunction.

2

of Farrow who sued Appellees regarding the termination of a prior business referral relationship with Insurance Office of America, Inc. ("IOA").[2]

Appellees are IOA, a large insurance broker, and John Ritenour and Heath Ritenour, principals in IOA.

**Initial Actions Targeting Appellees**

It is undisputed that Spagnuolo entered into a paid referral arrangement with John Ritenour as a result of and limited to referring one client to IOA. Spagnuolo received payments related to that referral beginning in 2014; however, the payments ceased in January 2019 when John Ritenour terminated his role as producer of the relevant accounts.

In March 2019, the Farrow Parties served a written demand for settlement on Heath Ritenour, the CEO of IOA, and his wife, who was not an officer or employee of IOA. The demand was served at the couple's home and demanded payment of more than five million dollars to resolve the Farrow Parties' clients' claims. The Farrow Parties' demand threatened that Heath Ritenour and IOA would be subjected to a "public spectacle" if

---

[2] David Naughton ("Naughton"), Roy Caswell ("Caswell"), Woodrow Power ("Power"), and Spagnuolo were identified as clients of Farrow Law and were listed as defendants below ("Clients"). Of the Clients, Spagnuolo was the only one directly involved and specifically bound by the injunction and thus the only one who appealed. The trial court found no direct evidence that the other Clients were involved in harming Appellees.

3

payment was not forthcoming. In connection with this demand, the Farrow Parties served demand and document preservation letters on some of IOA's customers and certain insurers with which it did business. The Farrow Parties also sent a similar demand letter to Don Whitten, who is both pastor of the Ritenours' church and Heath Ritenour's father-in-law.

**Appellants' Lawsuits, Postings, and Communications**

When the settlement demand was not paid, the Farrow Parties filed actions in September 2019 for each Client against the IOA Parties alleging violations of Florida's civil RICO statute and fraud, among other claims. Generally, the suits filed by the Farrow Parties for the Clients alleged that IOA and the Ritenours were involved in stock manipulation, inflated the value of IOA's private stock, stole accounts from competitors, overbilled clients, and engaged in impermissible insurance rebating to their customers.

After those suits were filed, the Farrow Parties issued what they referred to as "press releases" and "notices to witnesses" in both written and video formats. The "press releases" and "notices to witnesses" repeated or referenced the contents of the Clients' accusatory pleadings and sought anybody with information to contact them. The Farrow Parties paid one or more third parties to forward their "press releases"; they were not picked up or disseminated by newspaper, radio, or television.

4

Some of the "press releases" contained the IOA trademarked logo as well as photos of John Ritenour, Heath Ritenour, and Heath's mother, despite having no permission for doing so. Some of these "press releases" contained a decades' old mug shot of Heath Ritenour taken after he was arrested for a traffic offense that was completely unrelated to any of the Clients' litigation or claims.

Various "press releases" and "notices to witnesses" asserted that IOA and the Ritenours engaged in securities fraud, RICO violations, stealing, illegal activities, nefarious actions, Ponzi schemes, gangster-like behavior, gender discrimination, unequal pay, mistreatment of female IOA employees, and that IOA's insurance license had been or was likely to be revoked. Certain of the Farrow Parties' "press releases" reported on the outcome of various hearings or other litigation in a misleading manner to create the impression that they or their clients prevailed when in fact they had not.

These "press releases" were posted and reposted almost simultaneously by Spagnuolo on three different LinkedIn accounts that he controls. Only one of the accounts, his own, was legitimate. Another was identified as VIP Risk America, a defunct company, associated with Spagnuolo. The final LinkedIn account was completely fictious, using a

fictious individual identity, Charles Reynolds, with its profile photograph being that of Spagnuolo's former colleague, Charles Goldman.[3]

Spagnuolo sometimes employed hashtags of IOA's clients so as to target them and he tagged the Ritenours' church in one post.

Emails with similar claims or accusations were sent by one or more of Appellants from anonymous "proton" email accounts to IOA's clients and business partners. Other proton emails were sent to the Florida Bar, accusing IOA's in-house counsel of criminal witness tampering and included links to various of the Farrow Parties' "press releases."

**Appellees' Suit for Damages & Injunction**

In March 2020, IOA and the Ritenours filed suit against the Farrow Parties and the Clients seeking money damages for alleged defamation, tortious interference with IOA's existing and potential business relationships, and abuse of process. They later moved for entry of a temporary injunction to halt alleged ongoing tortious interference with IOA's business. The Farrow Parties and Clients filed opposing papers in which they asserted that injunctive relief was barred by the Free Speech clause of the First Amendment and the common law litigation privilege.

---

[3] Goldman, who is not a party to this case, had not given permission for the use of his likeness on the fictitious Reynolds account.

6

**Injunction Hearing and Court's Findings**

The trial court conducted evidentiary hearings over the course of three days during which certain parties and experts testified and numerous exhibits were admitted into evidence regarding the motion for temporary injunction.

Jay Farrow testified that his notices to witnesses were not efforts to obtain new clients but were efforts to investigate and gather evidence to support the Clients' claims. He further testified that because they were supposedly not advertisements, they were not subject to review or regulation by the Florida Bar which does pre-screen lawyer advertisements of all sorts. Farrow admitted sending out demand letters to Heath Ritenour and the demand and preservation letters to some of IOA's clients and customers. He further admitted that he uses "heavy-handed" and "relentless" litigation tactics. Evidence was presented of a podcast in which Farrow stated that he "goes after spouses of people that he is going after in court."

Spagnuolo claimed in his testimony that IOA stole millions of dollars from him, and he was looking for witnesses to support his lawsuit. He said he had been a part owner of VIP Risk America, which no longer existed at the time of the hearing, and admitted to owning and controlling the defunct company's website and social media accounts. Spagnuolo testified about

7

operating the fictitious LinkedIn account of Charles Reynolds and the VIP Risk America LinkedIn accounts. He said that he would receive Farrow Parties' communications about IOA, then post them to one account, add a comment, then forward it to another account, and so forth. Spagnuolo testified that this posting and reposting was done to "give more color to the story."

In addition to the foregoing, Spagnuolo created and controlled a website named "johnritenour.com" which featured photos of John Ritenour, his wife, and Heath Ritenour. The website was created without John Ritenour's permission; likewise, none of the Ritenours gave permission for the use of their names on that site. Spagnuolo posted the Farrow Parties' "press releases" to this website and also posted links to the website on the fictious Charles Reynolds account. He admitted that he posted videos regarding the Ritenours and IOA on the johnritenour.com website. In an effort to distance himself from the website, Spagnuolo transferred ownership and control of this site to a third-party webhost "Njalla" which attempts to maintain its customers' anonymity.

Heath Ritenour testified that he was personally aware of having lost numerous accounts and potential accounts due to the Farrow Parties' "press releases." He advised the court that in the current business world, potential

customers unfamiliar with IOA would typically search the internet for information and due to Appellants' activities, they would be led to the unflattering, possibly defamatory, misleading or false statements described above. He also identified screen shots depicting one method of leading potential clients to the Farrow Parties' "press releases" or website. Paid click through ads, sponsored by the Farrow Parties, would be first in line in a Google search for anybody searching for IOA. When clicked, those ads would take the searcher to the Farrow Parties' website where the various "press releases," all negatively commenting on IOA, were available for review.

Heath Ritenour discussed two specific customers targeted by Appellants' communications, who advised IOA in writing that they were not going to do business with IOA because of what they had read in the Farrow Parties' articles and out of concern for the Farrow-created rumor that IOA was at risk of losing its insurance license.

Heath Ritenour testified that he was forced to fly to Texas to meet with one client or potential client, during the Covid pandemic, in an effort to offer reassurances in the face of the Farrow Parties' "news releases" which the client had reviewed. Heath further testified that IOA lost employees and at

least one intern as a result of the Farrow Parties' misleading communications.

One of IOA's clients, a professional sports team, received an email, which included portions of the Farrow Parties' paid press releases, from a proton email account controlled by one of Appellants, stating that IOA was facing fraud and racketeering charges.

The trial court found that the Farrow Parties had delivered the initial $5 million demand to Heath Ritenour and his wife and that there was uncontroverted evidence that the Farrow Parties conferred and consulted with Spagnuolo on a routine basis with regard to the "press releases" they posed and reposted. The trial court determined that the press releases and notices to witnesses included information or allegations that were unrelated to lawsuits pending at the time of their release. The court further found Appellants' use of the term "notices to witnesses" was disingenuous; they were advertisements intended to further the business interests of the Farrow Parties. The trial court concluded that the Appellants' press releases had reported the outcome of hearings and litigation related to Appellees in a misleading fashion.

The trial court determined that Appellants had been engaged in "an ongoing and systematic campaign to interfere with the business relationships

of Plaintiff, IOA, through the targeting of business associates, with internet communications, Proton emails and social media tagging, and direct demands." The court went on to find that Appellees had laid the foundation for proving the elements of tortious interference and that Appellants' activities harmed IOA by damaging business relationships with customers, potential customers, insurance companies, and others who were known by the Farrow Parties and Spagnuolo. The trial court found that Appellants' interference with IOA's business was not justified and in fact was malicious. Finally, as to the tortious interference claim, the court found that there had been damages but that quantifying them would be nearly impossible at this time leading to the conclusion that they had or may suffer irreparable harm.

According to the court's findings, the use of the Ritenours' names, likenesses, creation of the johnritenour.com web site, and utilizing the IOA logo was done by Appellants without permission from Appellees and constituted a violation of section 540.08, Florida Statutes (2020). The trial court made similar findings as to Appellants' use of Charles Gordon's photograph in connection with the fictitious Charles Reynolds LinkedIn account. Appellants' use of Heath Ritenour's 23-year-old mugshot, according to the trial court, was without permission and an effort by

11

Appellants to mislead those having or contemplating business relations with IOA.

## Temporary Injunction

On April 26, 2021, the trial court entered its written temporary injunction. The temporary injunction order contained eight numbered paragraphs which enjoined one or more of Appellants from engaging in various stated conduct or communications which the trial court found to be either misleading to the public, interfering with Appellees' business relationships, in violation of Florida statutory law, otherwise objectionable, or some combination of those inappropriate qualities. Rather than repeat the verbiage of the temporary injunction at this point, each paragraph of the order will be set forth and analyzed below.

## Applicable Legal Principles

The following general principles are important to keep in mind when analyzing the temporary injunction that is being appealed. "[A] party seeking injunctive relief must show (1) irreparable harm, (2) an inadequate legal remedy, and (3) the existence of a clear legal right." *Murtagh v. Hurley*, 40 So. 3d 62, 66 (Fla. 2d DCA 2010) (citing *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1373 (Fla. 4th DCA 1987)).

12

Special considerations come into play when the actions to be enjoined are or may be protected as First Amendment free speech. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Fox v. Hamptons at Metrowest Condo. Ass'n*, 223 So. 3d 453, 456 (Fla. 5th DCA 2017) (quoting *Vrasic v. Leibel*, 106 So. 3d 485, 486–87 (Fla. 4th DCA 2013)). "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Id.* (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

"[I]njunctions are not available to stop someone from uttering insults or falsehoods." *Krapacs v. Bacchus*, 301 So. 3d 976, 980 (Fla. 4th DCA 2020); *see Vrasic*, 106 So. 3d at 487 ("[P]rotection against prior restraints on speech extends to both false statements and to those from which a commercial gain is derived."). "In fact most prior restraints on an individual's constitutional right of free expression are presumptively unconstitutional." *Weiss v. Weiss*, 5 So. 3d 758, 760 (Fla. 5th DCA 2009). "Because injunctive relief is generally unavailable, a complainant is typically left to his or her remedy at law." *Id.*

Although equity will typically not be used to enjoin a person from making allegedly defamatory statements, there is an exception for defamatory statements which are uttered or published incident to another

13

tort, including interference with a present or prospective business relationship. *See Murtagh*, 40 So. 3d at 65–66; *DeRitis v. AHZ Corp.*, 444 So. 2d 93, 94 (Fla. 4th DCA 1984) (holding that an injunction was the proper remedy in cases alleging interference "with a present or prospective business relationship"); *Azar v. Lehigh Corp.*, 364 So. 2d 860 (Fla. 2d DCA 1978) (holding that a trial court has broad discretion to enter a temporary injunction to prohibit interference with business relationships).

### Detailed Analysis of Injunction

The first paragraph enjoining Appellants states:

1. The Court is enjoining the reporting on court hearings in a manner which misleads the public with false information. The Court finds that as to Jay Farrow and Farrow Law that the press releases concerning the January 5, 2021 hearing, as well as the reporting on the NuView settlements, are misleading.

First Amendment free speech and press rights typically make injunctive relief unavailable to prevent the publication of false or misleading information. *Krapacs*, 301 So. 3d at 980; *Vrasic*, 106 So. 3d at 487. The temporary injunction forbidding the Farrow Parties from reporting on the court proceedings, even in a misleading fashion, is an unconstitutional prior restraint that cannot stand. For that reason, we quash the above paragraph and instruct the trial court on remand to remove it by issuance of an amended temporary injunction.

14

The second paragraph enjoining Appellants states:

2. As to Louis Spagnuolo, the Court is enjoining the use of the VRA (VIP Risk America) and Charles Reynolds' LinkedIn accounts, as well as the use of Charles Goldman's image and biography to comment on IOA, its owners, employees or customers, while finding that Mr. Spagnuolo has a right to utilize his first amendment rights for his own personal use, but he does not have the right to make posts under the guise of third parties who are not consenting or through fictitious LinkedIn profiles for non-existent persons or entities as this misleads the public and interferes with legitimate business interests, as to whose opinions are being put forth.

The second paragraph likewise constitutes an unconstitutional prior restraint on the exercise of First Amendment free speech, this time the rights of Spagnuolo. Accordingly, we quash the second paragraph and instruct the trial court to remove it on remand by issuance of an amended temporary injunction.

The third paragraph enjoining Appellants states:

3. The Court enjoins the use of Heath Ritenour's 23-year-old mugshot from an arrest which arose from an issue unrelated and not in connection with writings included on press releases, posts or websites that are unrelated in time, date and subject area to the allegations behind the arrest, for the use of interfering with legitimate business interests and partners. The Court finds this combination of picture and allegations in the lawsuit are not connected to any of the current allegations and misleads the public to believe the Plaintiff was arrested in connection with his business or the lawsuits. The "notices to witnesses" which utilize this practice are not reasonably likely to lead to finding witnesses or discoverable evidence in this or the other employment-based cases. The use is a vehicle to interfere with the business

15

relationships of Heath Ritenour, the managing partner of IOA, and to harm IOA's business by misleading the public as to when and why the incident occurred.

To the extent that Appellants were using the mugshot to further their own commercial interests, as the trial court found, the injunction is specifically authorized by section 540.08, which states in pertinent part:

(1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by:
(a) Such person;

* * * *

(2) In the event the consent required in subsection (1) is not obtained, the person whose name, portrait, photograph, or other likeness is so used, . . . .may bring an action to enjoin such unauthorized publication, printing, display or other public use, and to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.

Appellants' argument that the mugshot is not being used to market the Farrow law firm falls short. The statute prohibits its use, without Heath Ritenour's permission, for any trade, commercial, or advertising purpose which certainly encompasses Appellants' use of the photograph to encourage settlement through personal harassment and intentional interference with Appellees' current and potential business relationships.

16

Appellants' argument that a litigation privilege permits them to repeatedly use the 23-year-old mugshot is likewise unavailing. Florida recognizes two types of privilege which shield litigation participants from liability for uttering defamatory or otherwise tortious statements during or in connection with litigation. The first is an absolute immunity as to acts occurring or comments made during the course of a judicial proceeding as long as it has some relationship to the proceeding. *See Arko Plumbing Corp. v. Rudd*, 230 So. 3d 520, 523–24 (Fla. 3d DCA 2017). There is also a qualified privilege that offers protection to a litigation participant for a comment or action that occurs during informal litigation-related circumstances, such as during investigative conversations with potential witnesses if it is relevant to the litigation-related subject of inquiry. *See DelMonico v. Traynor*, 116 So. 3d 1205, 1218 (Fla. 2013). Neither litigation privilege attaches to Appellants' use of the decades-old mugshot as it is completely irrelevant to Appellants' litigation against Appellees. Nor do Appellants have a First Amendment right to use the old mugshot to intentionally interfere with Appellees' current or future business relationships. *See Murtagh*, 40 So. 3d at 65-66. We thus affirm this paragraph of the temporary injunction.

The fourth paragraph enjoining Appellants states:

4. The Court is enjoining the use of John Ritenour's, Heath Ritenour's and Valli Ritenour's name and likeness and the IOA logo without authorization. The Court finds that some of the posts were for purposes other than for notices to witnesses in that they appear to advertise for Mr. Farrow's law firm or for himself personally.

To the extent that Appellants are using John Ritenour's, Heath Ritenour's or Valli Ritenour's name and likeness "for purposes of trade or for any commercial or advertising purpose" without their permission, it would appear to violate section 540.08, Florida Statutes, and that could be enjoined. However, the above-quoted paragraph from the temporary injunction says that only "some" were used for advertising; thus, there is no basis under section 540.08 to completely ban Appellants' actions and communication. "An injunction should never be broader than is necessary to secure to the injured party relief warranted by the circumstances involved in the particular case." *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1091 (Fla. 3d DCA 2014) (citing *DeRitis*, 444 So. 2d at 94). "Entry of an overly broad injunction [barring or limiting communication] can constitute a violation of the First Amendment." *Id*.

Accordingly, we reverse as to this fourth paragraph and remand with instructions for the trial court to limit this aspect of the injunction so as to prohibit only the use of their names or likeness for trade, commercial, or advertising purposes. To the extent that Appellee IOA proved that

18

Appellants have used its duly registered trademark without authorization, the injunction is affirmed.

The fifth paragraph enjoining Appellants' actions states:

5. The Court is enjoining any actions in violation of either Sections [540.08] and 817.568, Florida Statutes. The Court enjoins the unauthorized use of the LinkedIn profile for Charles Reynolds and any use of the images of people who Mr. Spagnuolo did not, and does not, have authorization from to post about IOA, Heath Ritenour and John Ritenour as it is misleading and appears to offend the referenced Florida Statutes.

An injunction which generally states that those enjoined shall not violate the law or specific statutes is typically considered too vague to stand. An injunction "may not be drawn to enjoin all conceivable breaches of the law; it must instead be carefully tailored to remedy only the specific harms shown." *Pediatric Pavilion v. Ag. for Health Care Admin.*, 883 So. 2d 927, 930 (Fla. 5th DCA 2004). "It must be adequately particularized and phrased in such language that it can with definiteness be complied with." *Id.* (quoting *Fla. Peach Orchards, Inc. v. State*, 190 So. 2d 796. 798 (Fla. 1st DCA 1966)).

Additionally, this paragraph appears to prohibit the use of the Charles Reynolds account by Spagnuolo for making any comments about IOA, Heath Ritenour, or John Ritenour. We agree with Appellants that the scope of this paragraph is overly broad, as it prohibits Spagnuolo from making and posting comments that are perfectly acceptable and protected by the First

19

Amendment. In *Delgado v. Miller*, the Third District held that the relevant order was overbroad when it "prohibit[ed] either party from 'engag[ing] in any social media of any nature which comments, directly or indirectly, on the other party's emotion or mental health or personal behavior.'" 314 So. 3d 515, 518 (Fla. 3d DCA 2020).

Finally, we note that section 817.568, Florida Statutes (2021), is a criminal statute that provides punishment for those who are convicted of using personal identification information fraudulently or to harass a person. By its clear text, that section prohibits the unauthorized personal identification of an individual, deceased individual, or a dissolved business entity and specifies that "individual" means a single human being and excludes, *inter alia*, any corporation. § 817.568(1)(d), Fla. Stat. Thus, it has no application to IOA and does not explicitly provide a private cause of action.

Accordingly, we reverse as to this fifth paragraph and instruct the trial court to remove same from any amended temporary injunction.

The sixth paragraph enjoining Appellants states:

6. The Court enjoins Defendants, Jay Farrow, Farrow Law and Louis Spagnuolo, and any others acting in concert or participation with them, from contacting clients or prospective clients of IOA or IOA's current or prospective clients with the Farrow Law advertisements under the guise of notice to witnesses. The Court is enjoining the

20

use of misleading social media accounts to create a self-reinforcing feedback loop by reposting matters about IOA, John Ritenour and Heath Ritenour and making them appear to be the words of someone other than the Defendants in this case. Particularly, the Court enjoins the use of hashtags or direct contacts to individual companies known to do business with IOA for the purpose of disparaging IOA to interfere with and harm its business relationships, including those referenced in the hearing such as Chubb, Custom Pools & Spa, the Orlando Magic and the other entities which were referenced in the testimony herein.

To the extent that this paragraph purports to enjoin anybody other than Appellants from contacting Appellees' current or prospective clients, it is quashed because the trial court has no jurisdiction over non-parties and without naming those "others," Appellants are not sufficiently advised of whom they must avoid.

Appellants' argument that Appellees failed to make a prima facie case on tortious interference with current and prospective business relationships is unavailing. In *Sobi v. Fairfield Resorts, Inc.*, 846 So. 2d 1204, 1207 (Fla. 5th DCA 2003), we set forth the following as the elements underlying tortious interference:

(1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with that relationship; and (4) damage to the plaintiff as a result of the breach of the business relationship.

21

With regard to the current clients listed in this sixth paragraph, Appellees did establish that there are or were business relationships between IOA and those clients. Appellees showed that Spagnuolo, the Farrow Parties, and some of the other Clients had knowledge of those relationships. Moreover, Appellees established that Appellants were intentionally and without justification interfering with those relationships and likely caused some damage to those relationships.

Appellees also offered proof of specific prospective business relationships in terms of both clients and employees with IOA that received and were disrupted by some of Appellants' activities and communications, but did not sufficiently prove that Appellants knew of their relationships with Appellees. Therefore, this paragraph is overly broad because it purports to bar Appellants from contacting prospective clients of IOA without identifying them in a detailed fashion. *See Angelino v. Santa Barbara Enters., LLC*, 2 So. 3d 1100, 1104 (Fla. 3d DCA 2009) (finding temporary injunction overbroad where it enjoined Angelino from usurping appellee's business opportunities, customers, and suppliers without listing the customers or suppliers). The overbreadth also infects the ban on Appellants contacting any current clients that were not identified in this paragraph. There is competent, substantial evidence in the record to confirm that those named

22

in this sixth paragraph as current clients are accurately and adequately described. The fact that Appellants sent demand and document preservation letters to some of IOA's current clients as well as Appellants' use of hashtags and other targeting tools, undercuts their claimed lack of knowledge regarding IOA's business relationships.

On remand, the trial court for this paragraph shall include a list of the current clients of IOA in accordance with the evidence who are not to be contacted by Appellants. Likewise, the trial court shall further amend the temporary injunction to enjoin Appellants from contacting any other entities or individuals known by Appellants to be existing clients of IOA. However, the evidence presented did not establish that Appellants had knowledge regarding who were Appellees' potential clients; thus, that portion of the injunction prohibiting contact with potential clients is reversed and shall be removed on remand. On remand, the trial court must revise the sixth paragraph to correct the deficiencies discussed above or otherwise limit the scope of that paragraph.

The seventh paragraph enjoining Appellants states:

7. The Court enjoins any false statements or inferences with regard to IOA, John Ritenour or Heath Ritenour and the suspension of their insurance license. The Court finds that it is uncontroverted through all the evidence that the Court has no evidence of any current actions before this Court, any other Court, or any Administrative Agency, that there is an action to

23

suspend the licenses of these parties. No party or witness testified that there were or are any current actions or even alleged action that was occurring against the insurance license of IOA.

Unlike the first paragraph discussed above, this seventh paragraph is specific and identifies Appellants' activities and communications that are clearly intended to interfere with current or prospective clients, and which would cause irreparable harm given the difficulty of quantifying the amount of business that IOA lost or may lose in the future. Accordingly, we affirm the seventh paragraph.

The eighth paragraph enjoining Appellants' actions states:

8. Farrow, Farrow Law, and Spagnuolo are enjoined, and thereby required to remove from public circulation, all statements or communications that they have posted about IOA or any of the other Plaintiffs that are false and would mislead the public or violate Sections [540.08] and 817.568, Florida Statutes.

This eighth paragraph suffers the same infirmity as the first paragraph, to the extent that it refers only to and requires removal of false or misleading communications. First Amendment free speech and press rights typically make injunctive relief unavailable to prevent the publication of false or misleading information. *Krapacs*, 301 So. 3d at 980; *Vrasic*, 106 So. 3d at 487. Furthermore, Appellants are entitled to be advised of the specific matters they must seek to remove where possible, such as the false claims that IOA has or is at risk of losing its insurance license. Likewise, to the

24

extent this eighth paragraph requires Appellants to remove content that violates section 540.08, they are entitled to be advised of the specific materials, such as Heath Ritenour's old mugshot and the johnritenour.com website, that fall within the affirmative injunction.  On remand, the trial court shall enter an amended paragraph that complies with this opinion.

Given the bases of our rulings with regard to each paragraph that actually enjoined Appellants' activities or communications, we need not address any other issues.  We remand this matter to the trial court for further proceedings in accordance with this opinion.

AFFIRMED IN PART, REVERSED IN PART; REMANDED WITH INSTRUCTIONS.

EVANDER and WALLIS, JJ., concur.