[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11714

_____

KIMBERLY GRIPPA,

                                        Plaintiff-Appellee,

*versus*

RONALD RUBIN,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:20-cv-00457-MW-MAF

_____

Before BRASHER, ED CARNES, and WILSON, Circuit Judges.

BRASHER, Circuit Judge:

This case raises questions of first impression about the appealability of an interlocutory order denying Florida's absolute and qualified litigation privileges in a defamation action. Ronald Rubin filed a lawsuit that named Kimberly Grippa as a member of a criminal enterprise. His lawyer mailed allegedly defamatory letters to state officials, asking them to investigate this alleged criminal enterprise and including copies of the complaint.

Grippa sued Rubin for defaming her through these letters, and Rubin moved for summary judgment. He argued that the letters were protected by Florida's absolute litigation privilege. In the alternative, he argued that, even if the letters were not protected by the absolute privilege, they were protected by Florida's qualified litigation privilege. He also claimed that he could not be held vicariously liable for his lawyer's letters.

The district court denied Rubin's motion for summary judgment on each ground, and he immediately appealed. We hold that the denial of Florida's absolute litigation privilege is immediately appealable under the collateral order doctrine, but we lack jurisdiction to consider the denial of the qualified litigation privilege or the remaining vicarious liability issue. We believe the district court correctly denied the absolute litigation privilege because the letters were sent outside the litigation process and included additional statements beyond those in the complaint. Accordingly, we affirm in part and dismiss in part.

## I.

In March 2019, Grippa interviewed for a job in the Florida government with Rubin. Ultimately, Rubin determined that Grippa was unqualified for the position and refused to hire her. Grippa alleged that Rubin made several discriminatory statements and behaved inappropriately based on her gender during the interview, which she reported. Due to these reports, Rubin was subject to an internal investigation.

As the investigation unfolded, Rubin sued various officials in the Florida government for orchestrating an allegedly sham complaint and investigation against him because he "refuse[d] to fall in line" with their criminal "enterprise." According to the complaint, these officials rely on a "system of blackmail and intimidation" to "consolidate their political power and advance their financial interests." When state employees refuse to cooperate, the enterprise uses the media to "extort their resignations with defamatory allegations or fires them outright so they can be replaced with obedient foot soldiers." In furtherance of the enterprise's goals, Rubin was asked to hire Grippa because her ex-husband was friends with a lobbyist and donated money to an official's election campaign, both of whom were enterprise members. Because Rubin refused to cooperate, the officials "blackmailed Rubin, threatening to publicly accuse him of sexual harassment if he did not immediately resign." Rubin refused to resign, which invited the allegedly false accusations from Grippa and others, as well as the ensuing investigation.

Although Grippa was not a party to the suit, Rubin named her as part of this criminal enterprise in his complaint.

Rubin's lawyer then wrote to high-ranking government officials and state investigators asking them to intercede in the internal investigation into Rubin and open a separate investigation into the accused officials' alleged misconduct. These letters specifically refer to the "improper, unethical[,] and perhaps unlawful conduct on the part of . . . [the] enterprise, including the orchestration and publication of allegations against Rubin." Additionally, the letters included copies of Rubin's complaint to support his accusations and requests.

Because of these letters and the media attention they garnered, Grippa claimed to suffer several injuries. Specifically, her reputation was harmed, she could not show up to work, she lost credibility with her coworkers, and she was professionally prejudiced. As a result, she sued Rubin for defamation in state court; Rubin then removed the case to federal court.

Rubin moved for summary judgment on several theories. He argued that he could not be held liable because the allegedly defamatory statements were privileged under either Florida's absolute or qualified litigation privileges and that he could not be vicariously liable for his attorney's conduct. The district court denied the motion, finding that the letters were not absolutely privileged because Rubin's attorney sent them outside the course of a judicial proceeding. The district court also determined that it could not recognize the qualified privilege because there was a genuine dispute

of material fact as to whether the statements were made with express malice. Last, the district court rejected the vicarious liability argument because the language in the letters suggested that Rubin directed his lawyer's actions.

Rubin then commenced this interlocutory appeal, challenging the district court's denial of summary judgment.

## II.

We review the denial of an immunity defense as well as appellate jurisdictional issues *de novo*. *Patel v. City of Madison*, 959 F.3d 1330, 1336–37 (11th Cir. 2020).

## III.

Rubin argues that the district court should have granted summary judgment for three reasons. First, he says that the statements in the letters were protected by Florida's absolute litigation privilege. Second, he argues that they were protected by the qualified litigation privilege. And third, Rubin argues that he cannot be held vicariously liable for his attorney's conduct.

Rubin argues that he can appeal the denial of summary judgment without waiting for the end of the litigation in the district court. He says that the Florida litigation privileges are immunities from suit, the denial of which "falls within the collateral order doctrine." *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1279 (11th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525, 529–30 & n.10 (1985)). And Rubin argues that, because we have jurisdiction over

6                        Opinion of the Court                    23-11714

the denial of these immunities, we can exercise pendent appellate jurisdiction over the issue of vicarious liability.

We address, in order, our jurisdiction over each issue Rubin has raised before turning to the merits.

*A.*

We start with the absolute litigation privilege. Florida law recognizes an absolute privilege for conduct occurring during the course of a judicial proceeding. The Florida Supreme Court has explained that "absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement . . . so long as the act has some relation to the proceeding." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994). We are familiar with this privilege and have dutifully enforced it in the past when applying Florida law. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1274 (11th Cir. 2004) (applying Florida's absolute litigation privilege which "affords absolute immunity for acts occurring during the course of judicial proceedings"). When evaluating whether the statement relates to a judicial proceeding, "much latitude must be allowed to the judgment and discretion of those who maintain a cause in court." *Myers v. Hodges*, 44 So. 357, 362 (Fla. 1907). This privilege provides an immunity from suit, not just a defense to liability, as litigants must be free to litigate "without fear of having to defend their actions in a subsequent civil action for misconduct." *Levin*, 639 So. 2d at 608.

23-11714               Opinion of the Court                    7

Applying the privilege requires balancing two competing interests: the public interest in allowing litigants to zealously advocate for their causes and the individual interest in avoiding slander. *DelMonico v. Traynor*, 116 So. 3d 1205, 1217 (Fla. 2013), *abrogated on other grounds by Askew v. Fla. Dep't of Child. & Fams.*, 385 So. 3d 1034, 1036 n.2 (Fla. 2024). Whenever the Florida Supreme Court has applied the absolute litigation privilege, the relevant statements were made "either in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body" because these settings were uniquely equipped with "safeguards" that protected both interests. *Id.* These safeguards arose from "the 'comprehensive control exercised by the trial judge whose action is reviewable on appeal' and the availability of other remedies through which the trial court could mitigate the harm" that may occur. *Id.* at 1215 (quoting *Fridovich v. Fridovich*, 598 So. 2d 65, 69 n.5 (Fla. 1992)). Conversely, "ex-parte, out-of-court statements" that are related to the underlying lawsuit are not entitled to absolute immunity because the safeguards are "either unavailable or far less effective." *Id.* at 1211, 1218.

Given the nature of the absolute litigation privilege as an immunity from suit, and its necessary connection to judicial proceedings, we conclude that we have jurisdiction to review this issue and that the privilege does not apply to the statements found in the letters.

1.

We begin with jurisdiction. We must not "exercise power we do not have over disputes Congress has not given us authority to decide." *United States v. Rojas*, 429 F.3d 1317, 1320 (11th Cir. 2005). Because Rubin raises a state law immunity issue, we must apply federal law to assess our jurisdiction and state law to determine the substance of the privilege. *See Butler v. Gualtieri*, 41 F.4th 1329, 1335 (11th Cir. 2022).

Rubin has appealed from the denial of his summary judgment motion and, usually, we would lack jurisdiction to review that kind of order. We are a court of limited jurisdiction and, in general, we are "barred from entertaining appeals of non-final orders because we have no congressional grant to do so." *Hall v. Flournoy*, 975 F.3d 1269, 1274 (11th Cir. 2020)*; see* 28 U.S.C. § 1291. But we may nonetheless immediately review orders that "fall into a specific class of interlocutory orders that are made appealable by statute or jurisprudential exception." *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1327 (11th Cir. 2000); *see* 28 U.S.C. § 1292; *Atl. Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 375–76 (11th Cir. 1989).

As relevant here, Rubin argues that we can consider this appeal because the denial of Florida's absolute litigation immunity falls within the collateral order doctrine. To be immediately appealable under this doctrine, the order must satisfy three conditions. *Plaintiff A v. Schair*, 744 F.3d 1247, 1253 (11th Cir. 2014) (citing *Will v. Hallock*, 546 U.S. 345, 349 (2006)). The order must "(1)

conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Id*. (quoting *Will*, 546 U.S. at 349). Because the denial of the absolute litigation privilege in this instance meets all three criteria, we conclude that we have jurisdiction to review the district court's decision. *See Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1272 n.1 (11th Cir. 2019) ("[D]enials of immunity from suit . . . are immediately appealable under the collateral order doctrine.").

First, the district court's denial of summary judgment unquestionably constituted a conclusive determination on the absolute litigation privilege issue. Although denials of summary judgment may not ordinarily exhibit the finality necessary to trigger an immediate appeal, "there can be no doubt that such orders constitute a complete, formal, and, in the trial court, final rejection" of the absolute litigation privilege. *See Abney v. United States*, 431 U.S. 651, 659 (1977) (immediately reviewing denial of defendant's motion to dismiss indictment where defendant claimed prosecution was barred by the Fifth Amendment's double jeopardy immunity). Once the district court denied Rubin's motion for summary judgment, "[t]here [were] simply no further steps that [could] be taken in the District Court to avoid the trial" that Rubin insists was precluded by the absolute litigation privilege. *Id*.

Second, the availability of the absolute litigation privilege is critically important to the continued functionality of the judicial process and entirely distinct from the merits of the case. As the

Florida Supreme Court explained, litigants "must be free from the fear of later civil liability" based on what they say during litigation "so as not to chill the actions of the participants in the immediate claim." *Levin*, 639 So. 2d at 608. Without this protection, "the chilling effect on free testimony would seriously hamper the adversary system." *Id*. We agree. The judicial process requires that one party accuse another party of some wrong. As "adversarial" may imply, this process can be personal, uncomfortable, and hostile. It is a system predicated on differences, whether those differences relate to positions, perspectives, interpretations, or understandings of fact and law. By bringing a dispute to court, we try to resolve those differences and discover truth. But we cannot arrive at the ultimate answer without first asking difficult questions. And a system in which parties cannot freely identify these differences or present challenging questions—without fear of defamation litigation—is incompatible with this pursuit.

Not only is the absolute litigation privilege important, but it is also separate from the underlying dispute over whether Rubin defamed Grippa. In arguing that he is entitled to the privilege, Rubin does not engage with the merits of Grippa's claim. In fact, if he were immune from suit, he could admit to the underlying allegations against him and still avoid liability. This dynamic captures what it means for an order to be collateral to the core issue. As the Supreme Court explained in the double jeopardy context, absolute immunity is "collateral to, and separable from the principal issue" because "the defendant makes no challenge whatsoever to the merits of the charge against him" but instead "contest[s] the very

authority" of the opposing party to prosecute him. *Abney*, 431 U.S. at 659. Truth, falsity, intent, and harm—although relevant in a defamation action—have no impact on the applicability of the absolute privilege. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (listing the elements of defamation under Florida law). All that matters is whether the statement was made in the course of judicial proceedings and was related to those proceedings. *Levin*, 639 So. 2d at 608. Therefore, the privilege is separate from the merits of Grippa's claim and satisfies the second requirement of the collateral order doctrine.

Third, the district court's denial is effectively unreviewable on appeal from final judgment because the absolute litigation privilege is an immunity from suit. In diversity cases, we are bound by state substantive law on the issue of immunity. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Butler*, 41 F.4th at 1335. Therefore, Florida courts' description of the privilege binds us on the collateral order doctrine's third prong. They have said, and we have recognized, that "Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings." *BellSouth Telecomms.*, 372 F.3d at 1274; *Levin*, 639 So. 2d at 608 (Florida Supreme Court referring to the privilege as an "absolute immunity"). And as the Florida Supreme Court made clear, an absolute immunity is intended to protect parties from the "fear of having to defend their actions in a subsequent civil action." *Levin*, 639 So. 2d at 608. An immunity from defending one's actions in a lawsuit cannot be vindicated on appeal after a judgment. The only way Rubin can preserve that interest is by commencing an immediate appeal.

Grippa notes that the Florida courts have described this litigation privilege as an "affirmative defense" and argues that this distinction precludes our jurisdiction. We disagree. True, Florida courts have described the privilege as an affirmative defense. *See Am. Nat. Title & Escrow of Fla., Inc. v. Guarantee Title & Tr. Co.*, 810 So. 2d 996, 998 (Fla. 4th Dist. Ct. App. 2002). But an "affirmative defense" for purposes of pleading is not necessarily a "defense to liability" that can be addressed on appeal at the conclusion of the litigation. *See Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1367 (11th Cir. 2016). An affirmative defense is one that, "if established, requires judgment for the defendant even if the plaintiff can prove his case by a preponderance of the evidence." *Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999). Many kinds of immunity are routinely pleaded as affirmative defenses. *See, e.g.*, *Moore v. Morgan*, 922 F.2d 1553, 1557 (11th Cir. 1991) ("Qualified immunity is an affirmative defense to personal liability that the defendant has the burden of pleading."). The tendency of the Florida courts to describe the absolute litigation privilege as an affirmative defense is not dispositive to whether the denial of that privilege is immediately appealable.

Our conclusion is consistent with those of our sister circuits. In *Shanks v. AlliedSignal, Inc.*, the Fifth Circuit reviewed a collateral appeal of Texas's own absolute litigation privilege. 169 F.3d 988 (5th Cir. 1999). Similar to Florida's privilege, Texas law protects "communications made during the course of judicial, quasi-judicial, or legislative proceedings" and prohibits them from "constitut[ing] the basis of a civil action." *Id.* at 992 (quoting *Reagan v.*

*Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942)). The Fifth Circuit explained that requiring the defendant to proceed to final judgment before reviewing a denial of absolute immunity "could deprive [the defendant] of [his] entitlement to avoid the burdens of trial." *Id.*

The Tenth Circuit reached a similar conclusion in *Robinson v. Volkswagenwerk AG*, 940 F.2d 1369 (10th Cir. 1991). There, the Tenth Circuit considered a collateral appeal in which the defendant argued that it was entitled to the Oklahoma absolute litigation privilege. *Id.* at 1370. Oklahoma's privilege protects lawyers from "defamation actions based upon litigation conduct in judicial proceedings." *Id.* at 1372. Citing *Cohen*, from which the collateral order test is derived, the Tenth Circuit determined that it had "jurisdiction based on the collateral order doctrine as applied to a denial of absolute immunity." *Id.* at 1370 (citing *Cohen,* 337 U.S. at 546–47).

Because the denial of Florida's absolute litigation privilege conclusively determines a distinct and important issue which is effectively unreviewable on appeal from final judgment, we have jurisdiction to consider this appeal under the collateral order doctrine.

2.

Having concluded that we have jurisdiction to hear this appeal, we believe that the absolute immunity argument fails. Florida's absolute litigation privilege applies only when the statement was made during a judicial proceeding and only if the statement was related to those proceedings. *Levin,* 639 So. 2d at 608. And the

Florida courts have recognized the privilege only if the statement was made before a judicial officer or in documents filed with a court or quasi-judicial body. *DelMonico*, 116 So. 3d at 1217. The letters do not meet this standard.

Although the letters referenced Rubin's ongoing judicial proceeding, his lawyer did not send those letters within the course of that proceeding. Instead, he sent the letters to high-ranking government officials and investigators, asking them to oversee the internal investigation into Rubin's alleged misconduct and open a new investigation into other government officials' supposed criminal enterprise. True, the fact that these letters exist outside of the judicial process is not dispositive. Florida courts have recognized the privilege in other settings that are closely related to courtroom proceedings, including depositions, witness interviews, discovery, settlement discussions, and the like. *See Anderson v. Shands*, 570 So. 2d 1121, 1122 (Fla. 1st Dist. Ct. App. 1990); *Stucchio v. Tincher*, 726 So. 2d 372, 374 (Fla. 5th Dist. Ct. App. 1999); *Ange v. State*, 123 So. 916, 917 (Fla. 1929) (*receded from by Fridovich*, 598 So. 2d at 69); *see also BellSouth Telecomms.*, 372 F.3d at 1274–77. But the privilege is not recognized when "an attorney steps outside of both the courtroom and the formal discovery process to investigate a claim," *DelMonico*, 116 So. 3d at 1218, or when "false and malicious statements were made in order to bring about a judicial proceeding," *Stucchio*, 726 So. 2d at 374 (citing *Fridovich*, 598 So. 2d at 69). Rubin's lawyer took his allegations outside of his judicial proceeding by sending his complaint to uninvolved third parties with the hopes of launching

a new investigation and stifling an ongoing one. In doing so, he acted outside the scope of the privilege.

Rubin argues that the absolute litigation privilege applies because his lawyer attached the complaint, a publicly available court document, to the letters. The Florida Fourth District Court of Appeals addressed a similar argument, concluding that the absolute immunity privilege protected a lawyer who shared a copy of court documents with a reporter. *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th Dist. Ct. App. 1997). In a later case, the same court explained that *Stewart* departed from the general rule against protecting extra-judicial statements "in one limited context." *Ball v. D'Lites Enters., Inc.*, 65 So. 3d 637, 641 (Fla. 4th Dist. Ct. App. 2011). It clarified that, "at most," *Stewart* stood for the proposition that "the publication of the complaint or those documents which would be public records when filed in court would be covered by the [litigation] absolute immunity, because these documents *are* part of the judicial proceeding." *Id.*

The letters here exceeded the scope of the *Stewart* exception. Assuming without deciding that the Supreme Court of Florida would adopt the *Stewart* exception, *Stewart* was a narrow departure from the broader principle that the absolute privilege does not cover statements made outside of the judicial process. The exception covers only statements in public documents that are part of the judicial proceeding. The letters in this case, however, did not simply provide public records from the proceedings. They instead alleged "improper, unethical[,] and perhaps unlawful conduct on

16                  Opinion of the Court              23-11714

the part of . . . [an] enterprise." The attached documents amplified that allegation and connected it to Grippa. By adding this additional commentary, Rubin's lawyer went beyond the scope of the ongoing proceedings.

Because Rubin's lawyer made allegedly defamatory statements outside the judicial process, we conclude that the absolute litigation privilege does not apply.

*B.*

Next, we consider the qualified litigation privilege. In addition to the absolute litigation privilege, Florida law recognizes a qualified litigation privilege for "ex-parte, out-of-court statements" that are related to the underlying lawsuit and were made without express malice. *DelMonico*, 116 So. 3d at 1208, 1218–19. Unlike the absolute privilege, the qualified litigation privilege is a defense to liability that applies only upon the jury's finding of certain facts. *See Glickman v. Potamkin*, 454 So. 2d 612, 613 (Fla. 3d Dist. Ct. App. 1984) ("In a defamation action, the affirmative defense[] of . . . qualified privilege present[s] factual questions for resolution by the jury."); *Fariello v. Gavin*, 873 So. 2d 1243, 1245 (Fla. 5th Dist. Ct. App. 2004) (similar). Because the qualified privilege involves a question of fact that is typically decided by a jury, it cannot be an immunity from suit. With the contours of this privilege in mind, we consider whether denial of the privilege was a collateral order that qualified for immediate appeal. Applying the collateral order test, we conclude that we lack jurisdiction.

1.

The denial of the qualified litigation privilege fails each part of the collateral order test. We address each in turn.

First, the district court's denial did not conclusively resolve the availability of the privilege because the order was based on a genuine dispute of material fact concerning Rubin's *mens rea*. Express malice exists, and the qualified litigation privilege is precluded, when a statement is primarily motivated by "an intention to injure the plaintiff." *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984). To prove express malice, there must be "some evidence beyond the mere fact of publication," but evidence may be derived from "the style and tone" of the statement. *Myers*, 44 So. at 365.

The district court, at Rubin's behest, initially applied the wrong qualified privilege test. Although it did not invoke express malice to reach its conclusion, the district court did suggest that "the issue of malice is likely a question for the jury." In a later order, the district court dispelled any uncertainty and explained that it would still deny the privilege under the proper standard because there was a "genuine dispute of material fact as to whether or not [Rubin] acted with express malice." Based on this reasoning, the district court clearly did not definitively determine the qualified privilege issue and instead reserved the matter for the jury to decide. On this basis alone, the denial fails the collateral order test.

Second, we cannot disentangle the qualified litigation privilege from the merits of the case. The defendant's liability in a defamation action and the availability of the qualified privilege both

require a finding as to the defendant's *mens rea*. Statements are protected under the qualified privilege only if the defendant made them without express malice. *DelMonico*, 116 So. 3d at 1219. Similarly, a defendant can be liable for defamation against a private person only if he acted "at least negligently." *Jews for Jesus*, 997 So. 2d at 1106. These two issues turn on the answer to the same question of fact: what was the defendant's *mens rea*? Only after the jury answers this question can it decide either issue. Because the jury cannot answer one without the other, the matters are essentially entangled.

Third, the denial of the qualified litigation privilege can be adequately reviewed after a final judgment. Unlike the absolute privilege, which provides an immunity from suit, the qualified privilege provides a defense from liability. The "crucial distinction" between these two kinds of defenses is that an immunity from suit "can be enjoyed only if vindicated prior to trial." *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 269 (1982). True, there are "exceptional cases" in which the facts giving rise to the qualified privilege are so "clearly apparent" that a court may recognize the privilege on a motion to dismiss. *Fariello*, 873 So. 2d at 1245; *Nodar*, 462 So. 2d at 810. But, although the qualified litigation privilege can lead to a dismissal before trial, it does not necessarily protect the defendant from standing trial. *C.f. Will*, 546 U.S. at 351. The ordinary procedure, in which the jury must resolve questions of fact like the defendant's *mens rea*, necessitates trial. Because the qualified privilege is only a defense to liability and ordinarily depends on

fact findings by the jury, it is precisely the type of issue that can be properly reviewed upon the entry of a final judgment.

2.

Although we lack jurisdiction under the collateral order doctrine, Rubin argues that we should exercise pendent appellate jurisdiction because the absolute and qualified litigation privilege issues are sufficiently connected. If we have jurisdiction to review one interlocutory order, we may, at our discretion, review other orders under the pendent appellate jurisdiction doctrine "if they are 'inextricably intertwined' with an appealable decision or if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999) (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)). We have this tool at our disposal, but "we have not been shy about declining to indulge in it." *Jackson v. City of Atlanta*, 97 F.4th 1343, 1354 (11th Cir. 2024).

Assuming without deciding that these two issues are sufficiently connected to allow the exercise of pendent appellate jurisdiction, we exercise our discretion to decline review of this issue. *See, e.g.*, *Hartley v. Parnell*, 193 F.3d 1263, 1272 (11th Cir. 1999) ("To the extent we have discretionary pendent appellate jurisdiction . . . we decline to exercise that jurisdiction.") (citation omitted). Although both privileges apply only to statements that are related to a judicial proceeding, the qualified privilege also requires that the statements were made without express malice. As we have explained, that issue is closely related to the underlying merits of

Grippa's defamation claim. Because the qualified litigation privilege turns on a merits-related issue that is unrelated to the absolute privilege analysis, we decline to extend pendent appellate jurisdiction.

## C.

The third and final basis for Rubin's appeal is the district court's rejection of his vicarious liability argument. A vicariously liable party "has not committed any breach of duty to the plaintiff but is held liable simply as a matter of legal imputation of responsibility for another's tortious acts." Restatement (Third) of Torts: Apportionment Liab. § 13 cmt. b (2000). Under Florida law, "an attorney acting within the scope of his authority represents his client" such that his actions are attributable to the client and "his neglect is equivalent to the neglect of the client himself." *Griffith v. Inv. Co.*, 110 So. 271, 271 (Fla. 1926). Furthermore, "an employer can generally be held vicariously liable for an intentional tort where the employee's tortious conduct is undertaken in furtherance of the employer's interests." *Fields v. Devereux Found., Inc.*, 244 So. 3d 1193, 1196 (Fla. 2d Dist. Ct. App. 2018).

The district court's denial of Rubin's motion for summary judgment on the vicarious liability issue is not appealable. "Generally, an order denying a motion for summary judgment is not an appealable final order." *Schmelz v. Monroe County*, 954 F.2d 1540, 1542 (11th Cir. 1992). Nor is it a collateral order ripe for immediate review. Whether Rubin can be held vicariously liable for his lawyer's actions concerns the merits of the case, which are yet to be

decided and are reviewable upon the entry of a final order. Therefore, this appeal fails every factor of the collateral order test. *See Plaintiff A*, 744 F.3d at 1253. And because this matter represents an entirely separate issue from the absolute litigation privilege, we decline to exercise pendent appellate jurisdiction.

## IV.

For these reasons, we **AFFIRM IN PART AND DISMISS IN PART.**